FILED by ELECTRONIC

June 19, 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# 09-60911-Civ-JORDAN/MCALILEY

Q CLUB RESORT AND RESIDENCES
CONDOMINIUM ASSOCIATION, INC,

CASE NO.: _____

     Plaintiff,

v.

MAGISTRATE JUDGE _____

Q CLUB HOTEL, LLC

     Defendant.

_____/

## **COMPLAINT**

The Plaintiff sues the Defendants and states:

### **Jurisdiction and Venue**

1.     This is an action arising under the Sherman and Clayton Antitrust Trust Act, 15 USC § 1-2, 14 et ceq., as well as pendent state law claims. Jurisdiction is appropriate pursuant to 15 U.S.C. § 15 and 28 USC § 1331.

2.     The Plaintiff, Q Club Resort and Residences Condominium Association, Inc., (the "Association") is a Florida Non-Profit Corporation with its principal place of business in Broward County, Florida, and is otherwise *sui juris*.

3.     The Defendant, Q Club Hotel, LLC, ("Q Club" or "Developer") is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*.

4.     Venue is proper in this Court pursuant to 15 U.S.C. § 15(a) because the real property is located in Broward County, Florida, Defendant resides in the Southern District of Florida, and the contracts between the parties that are the subject of this action were executed

1

and were to be performed in Broward County in the Southern District of Florida.

## Factual Allegations

5.      The Q Club Hotel is a 333 unit condo hotel located on Ft. Lauderdale Beach.  In addition to the 333 residential units, the development also has six commercial units and a hotel unit.  The Q Club Hotel functions as a condo hotel through an exclusive licensing agreement with the Hilton Hotels Corporation, thereby operating as the Hilton Fort Lauderdale Beach Resort.  A condo hotel consists of units that can be used for either transient use by invitees or limited residency by the unit owner.

6.      As a condo hotel, the Q Club requires a property manager to oversee the rental pool, housekeeping and day-to-day operations of the hotel.  The Defendant was the developer and now acts as the property manger of the Q Club Hotel.

7.      The Association is the condominium association for the owners of the condominium units at the Q Club Hotel.

8.      As a condo hotel, the main incentive for purchasing and owning a unit within the Q Club Hotel is the unit owner's opportunity to participate in the rental pool for the Hilton Hotel. The rental pool consists of unit owners who agreed to enter into a unit management agreement (the "UMA") permitting their units to be leased as hotel rooms on a nightly basis.  Participants in the rental pool are supposed to receive housekeeping services, rental pool management, profit and utility sharing, and accounting management.

9.      While most developers outsource the management of their properties following construction, the Defendant Developer assumed the management responsibilities of both the property and the rental pool for the Hilton Hotel.

2

10.     Any Association members who want to participate in the rental pool were required to sign a UMA allowing the Developer to serve as the property manager and to act as the sole and exclusive agent for purposes of renting units, housekeeping and maintaining the rental pool for the Hilton.

11.     The initial UMA was for a term of 24 months, upon which time the initial contract would automatically renew for a period of 12 months, barring any notice to amend the agreement by either party. The terms of the initial UMA allocated 10% of the gross revenues from the rental pool to fees and commissions. From the remaining 90%, the Defendant and Plaintiff each received 50% of the net rental income, or the money remaining after the payment of fees and commissions. Of the 50% allocated to unit owners, 5% was placed in reserves, leaving the unit owners with 45% of the net rental income. A copy of the original UMA is attached hereto as Exhibit "A."

12.     In the event that either party wanted to revise the UMA, it could do so upon 60 days notice prior to the completion of the UMA.

13.     In January 2009, upon completion of the 24 month period, the Association sought to revise the initial UMA to more equitably distribute the income from participation in the rental pool. Accordingly, the Association proposed revising the UMA to allocate 60 % of the income to unit owners.

14.     In response to Plaintiff Association's request to change the terms of the UMA, Developer provided all unit owners with a Revised Management Agreement ("RMA"), the terms of which were even less favorable to the unit owners than the original UMA. The terms of the initial RMA allocates 15% of the gross revenues from the rental pool to fees and commissions. From the remaining 90%, the Defendant Developer receives 55% of the net rental income, and

3

unit owners are limited to 45% of the net rental income. Of the 45% of the net rental income allocated to unit owners, 5% is then placed in reserves. The changes in revenue allocation proposed by the RMA resulted in a 28.7% reduction in quarterly unit income. A copy of the Revised Management Agreement ("RMA") is attached hereto as Exhibit "B."

15.     The Association and majority of unit owners, perceiving the terms of the RMA as both unfair and retaliatory, refused to agree to the RMA.

16.     Consequently, On May 1, 2009, Jose E. Cabanas, on behalf of Q Club Hotel, LLC, sent an e-mail to Association members threatening that if the new RMA was not signed by May 22, 2009, the owner's unit would be removed from the rental pool. The email also stated that the Hilton Hotel would terminate its' agreement with the Q Club Hotel if a certain number of units are not included within the rental pool. A copy of the e-mail is attached hereto as Exhibit "C."

17.     On June 1, 2009, the Q Club sent a letter to all objecting unit owners stating that 40 of the 162 units rejecting the RMA had been removed from the rental pool and that additional units would be removed unless the terms of the new RMA were accepted. A copy of the letter is attached hereto as Exhibit "D."

18.     The majority of the unit owners within the Plaintiff Association purchased units within the Q Club Hotel based on the profits and incentives provided by participation in the rental pool and association with the Hilton Hotel. Removal of a unit owner's property from said rental pool would certainly be adverse to the interests of the majority of Plaintiff Association members because the condominium documents do not permit establishment of a competing rental pool, nor any mechanism to permit unit owners to rent their units directly to the public. Removal from the rental pool essentially puts those unit owners out of business.

4

19.     Under the terms of the Declaration of Condominium ("Declaration"), 80% of the voting members of the Association are required to amend any aspects of the hotel related services and/or easements over the property. Such services and easements include the Defendant's exclusive right to provide management and housekeeping services to the units within Q Club. Perhaps not coincidentally, the Defendant Developer maintains 85 votes (50 votes for the Hotel Unit, 18 votes for the six commercial units (3 votes x 6 units), and 17 residential units), which is 21% of the 401 total votes in the Property. The Defendant's control of 21% of the voting share prevents the Plaintiff Association from making any amendments to the service and management easements placed upon the property, at least according to the Declaration.

20.     Despite requests from the Association, the Defendant Developers have refused to negotiate with the Plaintiff Association regarding the terms of the RMA, and as a result of the voting shares maintained by the Defendant, the Plaintiff Association is unable to amend the terms of the Declaration of Condominium regarding easements.

21.     All conditions precedent to this action have occurred or been waived.

## COUNT I – MONOPOLIZATION OF THE RELEVANT MARKET
### Sherman Act - 15 USC § 1

22.     Plaintiff re-alleges paragraphs 1-21 as if set forth herein.

23.     In determining whether actual monopolization has occurred, it is necessary for the court to look to both the Defendant's possession of a monopoly power in the relevant market and their willful acquisition of that power. The relevant market is a question of fact determined by defining both the relevant product and geographic market within which a company exists.

24.     The services provided by the Defendant consist solely of housekeeping,

5

management of the rental pool and accounting services for the units included in the Q Club

Hotel.  These services are neither relevant nor useful outside of the Q Club Hotel, and therefore,

the geographic market is limited specifically to the units making up the Q Club Hotel.

     25.      According to the initial UMA, the Defendant is the exclusive provider of

housekeeping and rental management services for units included in the Hilton Hotel rental pool.

Unit owners may neither outsource housekeeping services nor solicit the rental of their unit on an

individual basis, but must specifically use the services provided by the Defendant.

     26.      The terms of the UMA, RMA and Declaration of Condominium suggest that the

Defendant willfully claimed the exclusive right over the market through their exclusivity clauses

and their refusal to allow for alternate services for unit owners that have not agreed to the terms

of the UMA or RMA.

     27.      Plaintiff has been damaged by Defendant's violation of 15 USC § 1.

     WHEREFORE Plaintiff demands judgment against Defendant Q Club Hotel, LLC for

damages for violation of 15 USC § 1, treble damages pursuant to 15 USC § 15, equitable relief

as appropriate, attorneys fees' pursuant to the Agreement and 15 USC § 15, and for such further

relief as this Court deems just and proper.

## COUNT II – ANTICOMPETITIVE AGREEMENT
### Clayton Act- 15 USC § 14

     28.      Plaintiff re-alleges paragraphs 1-21 as if set forth herein.

     29.      As a prerequisite for participating in the Hilton rental pool, the Defendant

Developer required that unit owners within the Plaintiff Association sign and agree to the terms

of the UMA.

     30.      15 USC § 14 of the Clayton Antitrust Act makes it unlawful for any person

engaged in commerce to make a contract for the sale of goods, wares, merchandise, machinery, supplies or other commodities where the contract is conditioned on the understanding that the purchaser shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the seller and where the effect of such contract for sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

31.     Both the Declaration of Condominium and the RMA prevent unit owners within Q Club and the rental pool from employing the use of outside rental and housekeeping services, and require that such services may only be provided by the Defendant Developer.

32.     The Defendant violated 15 USC § 14 by engaging in an unlawful and anticompetitive agreement that prevents the unit owners included within the Plaintiff Association from employing competition of the Defendant.

33.     The effect of the exclusivity agreements found in both the RMA and the Declaration of Condominium is one that substantially lessens competition and tends to create a monopoly within this relevant market.

34.     Plaintiff has been damaged by Defendant's violation of 15 USC § 1.

WHEREFORE Plaintiff demands judgment against Defendant Q Club Hotel, LLC for damages for violation of 15 USC § 14, treble damages pursuant to 15 USC § 15, equitable relief as appropriate, attorneys fees' pursuant to the Agreement and 15 USC § 15, and for such further relief as this Court deems just and proper.

## COUNT III – CONTRACT IN RESTRAINT OF TRADE
### Fla. Stat. § 542.18

35.     Plaintiff re-alleges paragraphs 1-21 as set forth herein.

7

36.     Pursuant to Fla. Stat. § 542.18, every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful.

37.     Defendant Developer has engaged the unit owners of the Plaintiff Association in an illegal and anticompetitive agreement for housekeeping services, rental management services and accounting services.

38.     The terms of both the UMA and RMA require that the unit owners included within the Plaintiff Association exclusively employ the management services provided by Defendant Q Club Hotel in order to remain within the rental pool of the Hilton Hotel.

39.     As indicated by the terms of the "Owner's Use of the Unit" clause within the UMA, these units were purchased by the members of the Plaintiff Association primarily for the investment and profitability purposes of participating in the Hilton Hotel rental pool.  Therefore, removal from the rental pool is materially adverse to Plaintiff Association's interests.

40.     The Defendant has effectively restricted trade through both an illegal and anticompetitive tying agreement, as well as through exclusivity clauses relating to the easements and management services.

41.     The terms of both the UMA and RMA expressly restrict trade as it relates to the management services provided to unit owners at the Q Club Hotel.

42.     The Plaintiff has been damaged by the Defendant's violation of Fla. Stat. §542.18.

WHEREFORE Plaintiff demands judgment for damages against Defendant Q Club Hotel, LLC for violation of Fla. Stat. § 542.18, treble damages pursuant to Fla. Stat. § 542.22, equitable relief as appropriate, attorneys fees' pursuant to the Agreement and Florida Statutes, and such further relief as this Court deems just and proper.

8

## COUNT IV – MONOPOLIZATION
### Fla. Stat. § 542.19

43.     Plaintiff re-alleges paragraphs 1-21 as set forth herein.

44.     Pursuant to Fla. Stat. § 542.19, it is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state.

45.     The Defendant is a "person" as defined by Fla. Stat. § 542.17(3).

46.     The Defendant has obtained a total market share as it relates to the relevant product of housekeeping and managerial services provided to the unit owners of Q Club, within the geographic location that is limited to the units and unit owners of Q Club Hotel.

47.     The Defendant's use of anticompetitive and illegal tying agreements prevents the unit owners of the Plaintiff Association from having access to other outlets of trade or commerce.

48.     Additionally, the exclusivity agreements included within the UMA, RMA and Declaration of Condominiums require that unit owners employ the management services provided by the Defendant Developer.

49.     The Defendant's monopolization of the relevant market suggests a clear violation of Fla. Stat. § 542.19.

50.     The Plaintiffs have been damaged by the Defendant's violation of F.S. § 542.19 and restrictions on commerce and trade.

WHEREFORE Plaintiff demands judgment for damages against Defendant Q Club Hotel, LLC for violation of Fla. Stat. § 542.19, treble damages pursuant to Fla. Stat. § 542.22, equitable relief as appropriate, attorneys fees' pursuant to the Agreement and Florida Statutes, and such further relief as this Court deems just and proper.

9

## COUNT V – BREACH OF CONTRACT – UNCONSCIONABILITY

51.     Plaintiff re-alleges paragraphs 1-21 as set forth herein.

52.     As a requisite for purchasing a unit at Q Club, unit owners were required to sign a

purchase agreement thereby accepting the terms of the Condominium.

53.     The Declaration of Condominium signed by the Plaintiff has the following

provision in Paragraph 16.3, titled Hotel Related Service:

> **"The Owner from time to time of the Hotel Unit shall have the exclusive right
> (but not the obligation) to provide hotel and/or transient rental services,
> including, but not limited to , solicitation and/or provision of housekeeping,
> personal services (i.e., massage, personal training, dry cleaning, etc.) and/or
> food and beverage service, to the Condominium and the Unit Owners.  No
> amendment to this Declaration or rule of the Association shall be adopted to
> impair or abridge the rights herein granted without an affirmative vote of not
> less than 80% of the total voting interests.**

54.     The above provision requires that 80% of all voting interests must vote

affirmatively to amend any aspect of the easement over their properties.

55.     The Defendant Developer just happens to control 21% of the Association votes.

56.     Even in the event of a unanimous vote from the non-developer members of the

Plaintiff Association, the Defendant would still have a sufficient number of votes necessary to

prevent any changes to the easements and hotel related services established by the Declaration.

57.     A contract fails for unconscionability when the contract is "one such as no man in

his senses and not under a delusion would make on the one hand, and as no honest and fair man

would accept on the other."

58.     The purchase agreement signed by unit owners is unconscionable as applied, as it

requires purchasers to adhere to terms of the Declaration of Condominium that are unjust,

unreasonable, and written to allow for the Defendant to maintain a substantial level of control

10

over the Property.

59.     Had the unit owners of the Plaintiff Association known that the Developer could

rig unit ownership so as to indefinitely maintain control over the property, there is no question

they would have refrained from signing their purchase agreements that applied the terms of the

Declaration.

60.     The Plaintiff has been damaged by the unconscionable terms of the Declaration of

Condominium as applied through the purchase agreement, as they were meant to limit the

Plaintiff's remedies against unjust easements over their property.

WHEREFORE, Plaintiff demands judgment against Defendant for breach of contract and

seek the remedies of cancellation and rescission of the Agreement, or in the alternative for

damages, together with interest, costs, attorneys' fees pursuant to the Agreement and such further

relief as this Court deems just and proper.


## COUNT VI – OBSTRUCTION OF AN EASEMENT

61.     Plaintiff re-alleges paragraphs 1-21 as set forth herein.

62.     Section 3.5 of the Declaration of Condominium lists the easements created and

recorded in regards to the Q Club Resort.  Subsection (e) addresses the "Ingress and Egress"

easement and provides that "it being understood and agreed by all Unit Owners that any such

services (housekeeping, personal services, food and beverage) may only be provided by the

Owner(s) of the Hotel Unit."

63.     The Defendant has willfully obstructed the easement regarding "Ingress and

Egress" for the "provision of any services" through the following:

        a.  Deceptively maintaining sufficient voting share to prevent amendments to the

11

easement in question.

b. Employment of a Revised Management Agreement (RMA) that, if not signed, will remove unit owners from the Hilton rental pool.

c. Refusing to deal with the Plaintiff Association to agree to terms beneficial to both parties.

64.     The Defendant's obstruction of the easement in Section 3.5(e) prevents members of the Plaintiff Association who refuse to agree to the terms of the RMA from both enjoying the services provided from the easement and from substituting alternate services in their place.

65.     Plaintiff has been damaged by the Defendant's obstruction of the easement of "Ingress and Egress" for provision of services.

WHEREFORE, Plaintiff demands judgment against Defendant for obstruction of an easement and seeks the remedies of injunctive relief and in the alternative for damages, together with interest, costs, attorneys' fees pursuant to the Agreement and such further relief as this Court deems just and proper.


## COUNT VII – VIOLATION OF FLA. STAT. § 718.302

66.     Plaintiff re-alleges paragraphs 1-21 as set forth herein.

67.     Fla. Stat. § 718.302(1)(a) states as follows:

"...any grant or reservation made by a declaration, lease, or other document, and any contract made by an association prior to assumption of control of the association by unit owners other than the developer, that provides for operation, maintenance, or management of a condominium association or property serving the unit owners of a condominium shall be fair and reasonable and...may be canceled by unit owners other than the developer...if the unit owners other than the developer own not less than 75 percent of the voting interests in the condominium."

68.     More than 75% of the non-developer owned units would not agree to the RMA

12

absent threat and coercion exercised by the Developer.

69.     Under Fla. Stat. § 718.302(1)(a), The Plaintiff Association is entitled to cancel the agreement.

70.     Additionally, pursuant to Fla. Stat. § 718.302(4), any grant or reservation made by a declaration, lease, or other document, and any contract made by an association prior to assumption of control of the association by unit owners other than the developer, must be fair and reasonable.

71.     The Defendant's strategic acquisition of sufficient voting shares necessary to amend the easement clause under section 3.5(e) of the Declaration of Condominium renders the clause virtually meaningless.

72.     The Plaintiffs have been damaged by the Defendant's violation of Fla. Stat. § 718.302.

WHEREFORE, Plaintiff demands judgment against Defendant Q Club Hotel, LLC for violation of Fla. Stat. § 718.302  and seeks rescission and/or reformation, as well as further equitable relief as appropriate, attorneys fees' pursuant to the Agreement, and such further relief as this Court deems just and proper

## COUNT VIII – FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA)

73.     Plaintiff re-alleges paragraphs 1-72 as set forth herein.

74.     The use of unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts in the conduct of any trade or commerce are unlawful under Florida Statute § 501.204.

75.     Chapter 501, Florida Statutes, known as the Florida Deceptive and Unfair Trade

13

Practices Act ("FDUTPA") is to be liberally construed to protect the consuming public, such as the Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

76.     The following acts of Defendant Developer constitute unfair and/or deceptive trade practices:

        a.   Implementation of an unlawful "tying" agreement.

        b.   Monopolization of the relevant market, as it relates to the relevant product and geographic location.

        c.   Restricting access to the Rental Pool for the Hilton Hotel.

        d.   Use of unfair exclusivity clauses within the management agreements.

        e.   Strategic control of voting power sufficient to limit amendments to easements on the property.

77.     The actions set forth in the preceding paragraphs are both unfair methods of competition and unconscionable acts and practices.  This conduct constitutes a violation of FDUTPA.

78.     Plaintiff has been damaged by Defendant's unfair and/or deceptive trade practices including monetary losses, denial of management services, denial of access to Hilton Hotel Rental Pool, inconvenience, frustration, and other incidental and consequential damages.

WHEREFORE, Plaintiff demands judgment against Defendant for all damages recoverable under law, including but not limited to, compensatory damages, incidental and consequential damages, attorneys' fees pursuant to the Florida Deceptive and Unfair Trade Practices Act, costs, interest, and such further relief as the Court may deem just and proper.

Dated: June 18th, 2009

JOSEPH E. ALTSCHUL, LLC
2717 W. Cypress Creek Road
Fort Lauderdale, FL 33309
(954) 556-4821 – Telephone
(954) 343-5600 – Facsimile

By: _____ DOII474
Joseph E. Altschul, Esq.
Florida Bar # 0867470

15

# Exhibit

# "A"

Oct 22 2008 9:08AM    HILTON FT LAUDERDALE BCH    9544142639    p.1

# FORM OF UNIT MANAGEMENT AGREEMENT

This UNIT MANAGEMENT AGREEMENT ("Agreement") is made and entered into this _4th_ day of _January_ 200_7_ (the "Effective Date") by and between Q Club Hotel, LLC ("Company") a Florida Limited Liability Company, and _Stacy Burgess and Fredenick Burgess_ (collectively and jointly and severally referred to in this Agreement as "Owner"), whose address is _____ _Weston, FL 33327_

_FRED_

| | |
|---|---|
| Owner's Social Security #: | Name of Corporation: |
| Home Phone: | EIN # (If corporation): |
| Office Phone: | Owner's Designate: |
| Fax # C | O.D. Address: |
| E-Mail address: f burgess@burgesslaw firm.com | O.D. Phone: |

## RECITALS

A.   Owner wishes to engage the services of Company as exclusive rental agent to offer Unit _1703_ (the "Unit") in the condominium project known as "Q-Club Resort and Residences Condominium" (the "Condominium") for rental under the terms and conditions set forth in this Agreement.

B.   The Condominium has been established and created in a building, a portion of which is comprised of a hotel which initially will be known as the Hilton Fort Lauderdale Beach Resort (the "Hotel").

C.   Company plans to advertise and promote the rental of Units at the Hotel.

D.   Company has engaged Hilton Hotels Corporation (the "Manager") to manage the Hotel and to include the Unit in Hotel Inventory.

NOW, THEREFORE, in consideration of the terms, conditions and the mutual covenants herein set forth, the parties agree as follows:

1.   DEFINITIONS. Capitalized terms will have the meanings set forth below or are defined elsewhere in this Agreement.

    a.   "Association" means the condominium association governing the Condominium.

    b.   "Furnishings Package" means the furnishings, furniture, accessories, appliances, curtains, carpeting, wall coverings, kitchen, bath and bedding items and such other personal property included in the initial purchase of the Unit from the Company, including, without limitation, dishes, silverware, glassware, cookware, linens, bedding and bath accessories.

HLT (FL) FT. LAUDERDALE – MGT AGT

Phoenix/267538.11
{00069115.DOC;2}

Oct 22 2008 9:08AM    HILTON FT LAUDERDALE BCH   9544142639    P.2

c.    "Guest" means any person or persons who rent the Unit, including complimentary Guests, but excluding Owner and Owner's immediate family.

d.    "HMA" means the Hotel Management Agreement under which Manager operates the Hotel for Owner.

e.    "Net Rental Income" means all room revenues from rental of the Unit, net of occupancy, sales and related taxes, less ten percent (10%) of such revenues for fees and commissions.

f.    "Owner" means the owner of the Unit and his or her immediate family, and any other guests of Owner whose reservation is made by Owner pursuant to Section 12, and who is not to be charged for occupancy of the Unit.

g.    "Owner's Rental Proceeds" shall have the meaning ascribed to such term in Section 4.b.

h.    "Reserve for Replacement" means a fund retained by Company, from gross monthly rental income of Owner's Rental Unit to be used specifically for major replacement of linens, furniture, fixtures, and equipment (FF&E), required by the Company in order to maintain Unit to a competitive level with other hotels in the area.

i.    "Rotation System" means the rental management system used by Company in order to ensure that in Company's sole discretion all of the Rental Units are fairly and equitably offered for rental. Company may divide the Units into different groups based on factors such as size, location and rental rate.

j.    "Services" means the brand and management services provided to the Hotel by Manager under the HMA, such as marketing, reservations, guest frequency program and accounting services.

k.    "Unit" means the Unit identified in Recitals, together with an undivided share of the common elements and liability for common expenses appurtenant thereto.

l.    "Units" means all of the condominium units at the Hotel for which Company serves as the exclusive rental agent.

2.    **EXCLUSIVE AGENCY.** Owner hereby retains Company as its sole and exclusive agent for purposes of renting the Unit to Guests, and Company agrees to act as the exclusive agent, subject to the terms and conditions set forth in this Agreement.

3.    **TERM.** The initial term of this Agreement shall be for twenty-four (24) months, commencing as of the Effective Date and ending twenty-four (24) months thereafter, unless terminated earlier as provided in this Agreement. Upon expiration of the initial term, this Agreement shall be automatically renewed for additional terms of twelve (12) months each unless Owner or Company, at least sixty (60) days prior to the expiration date of this Agreement, shall give written notice to the other party of its desire not to renew this Agreement. Notwithstanding the foregoing, (i) Company shall have the right to terminate this Agreement, in its sole and absolute discretion and whether with or without cause, upon sixty (60) days prior written notice to Owner; and (ii) Company shall have the right, in its sole and absolute discretion, to terminate this Agreement upon fifteen (15) days prior written notice to Owner, if, within sixty (60) days after the opening of the Hotel, Company has not entered into rental management agreements with the owners of at least 225 condominium units in the Hotel. Upon any termination of this Agreement, Company shall prepare a final reconciliation of accounts (including all sums owed under any provision of this Agreement) and a final settlement shall be accomplished between Owner and Company within thirty (30) days of Company's delivery to Owner of such final reconciliation.

HLT (FL) FT. LAUDERDALE – MGT AGT

Page 2

4. **RENTAL OF THE UNIT.** Company shall use its good faith efforts to rent the Unit in accordance with the following provisions:

a. The Company has the right to establish and adjust, from time to time, the rental rates for the Unit without notice to Owner, and to rent the Unit for the rates that it considers appropriate, in its discretion, based upon occupancy levels, seasonal demand, changes in operating costs, rates of competitive properties, and other prevailing market conditions.

b. Owner will receive 50% of the Net Rental Income from the Unit (the "Owner's Rental Proceeds") and Company will receive 50% of the Net Rental Income.

c. Simultaneously with the execution of this Agreement, Owner shall pay to Company a one-time non-refundable enrollment fee of $500.00 to be applied to the initial purchase of disposable operating supplies and amenities, as well as initial back-up inventory of linens required by the Company in order for the Unit to meet the standards for rental to the transient public.

d. During the term of this Agreement, Owner acknowledges that Company intends to rent the Unit to Guests on a transient basis. Company will endeavor to rent the Unit in accordance with the Rotation System, however, Company will rent out of order if a Guest specifically requests a particular Unit or a particular Unit type or location to the exclusion of others.

e. Company shall provide Owner, within thirty (30) days after the end of each calendar quarter, a statement of Owner's account showing the calculation of Net Rental Income and payment for Owner's Rental Proceeds earned by Owner under this Agreement during the preceding quarter.

f. Owner's telephone in the Unit will be configured so that calls made by Guests from the Unit go through the Hotel's switchboard and call accounting system, and Company will keep records of Guest usage of the telephone in the Unit and charge and collect from each Guest for such Guest's telephone usage. When occupying the Unit as provided in Section 12, Owner shall be charged for all long distance and local calls that are made through the Hotel's system at the same rate as Guests. If Owner has a private line for its use in the Unit, Owner is responsible for deactivating that line when not occupying the Unit. Company shall not be responsible for any charges incurred in connection with use of Owner's private line by Guests or by Owner.

g. Owner understands and agrees that Company has arranged that Manager (a) shall cause the Unit to participate in Manager's guest recognition program and to charge or credit the Unit with such participation during periods of guest occupancy on the same basis as all other Units; (b). may, from time to time, change the applicable rental rates to meet prevailing market conditions; and (c) may change the regularly advertised rate in circumstances such as, but not limited to, extended length of stay, group discounts, Manager or corporate discounts, package plan discounts or in similar situations when Manager deems it advantageous to charge a reduced rate. Owner authorizes Company to cause Manager to maintain its standard promotional material package in the Unit during the term of this Agreement, which package will not be disturbed by Owner.

h. Owner agrees that Manager may offer a renter a reduction in the applicable Hotel rental rate in the event of a failure of the heating or air conditioning systems or a major appliance, or the failure of utility service, or a guest's complaint about noise, service and similar matters in and about the Hotel. Owner agrees that the renter may be transferred to other accommodations if such reduction in rental rate is not acceptable to the renter. In the event of such a transfer, Owner shall be credited with a pro rata share of the rental

HLT (FL) FT. LAUDERDALE – MGT AGT

based upon the number of days of actual occupancy of the Premises. In the event the renter accepts the reduction in rental rate, the gross revenue reduction will be shared by Owner and Company in the same proportions as the then applicable rental revenue split. Company hereby advises Owner, and Owner understands and agrees, that failure of the type herein discussed may periodically cause a loss of rental income.

i.  Termination of this Agreement for any reason shall not cancel any confirmed reservations for the Unit, and the reservations, if not transferable to another Unit, shall remain binding upon, Owner, Owner's heirs, executors, legal representatives and assigns after termination of this Agreement. In the event of a termination, Company is entitled to any commissions, fees and/or expenses due as a result of the reservation made during the term of this Agreement.

j.  All reservations, including Owner referrals, must be made through Company so that they may be coordinated with other confirmed reservations. The Owner shall schedule personal use of the Unit with Company in accordance with Section 12 and will register with Company upon Owner's arrival. No notice of reservations secured by Company will be provided to Owner, except by specific request. The Owner will not be able to occupy, use or enter the Unit during periods of time when the Unit has been rented, and will not be able to schedule occupancy of the Unit during periods of time when the Unit has been reserved unless the reservation can be moved to a similar Unit prior to the time of occupancy.

k.  The rules set forth in this Section may, at the discretion of Company, be modified so long as such changes in the rules are reasonable and notice of the changes is provided to Owner.

5.  **MAINTENANCE AND CLEANING OF UNIT.**

a.  Throughout the term of this Agreement, Owner shall cause the Unit to be maintained, repaired and cleaned to a standard consistent with the other accommodations offered by Company in the Hotel. The Company may refuse to rent the Unit if, in Company's sole discretion, the Unit is not being maintained in a condition consistent with the accommodations offered by Company in the Hotel. The Owner shall be responsible for all costs associated with the maintenance, repair and cleaning of the Unit except that Company shall, at no charge to Owner, be responsible for the following minor items of maintenance and repair on an "as needed" basis: (i) replace light bulbs; (ii) assist the Guests and Owners with operation of TV's, VCR's and appliances; and (iii) repair and/or adjust hardware for window coverings, cabinetry and doorways. The Owner agrees that if the Unit or its furnishings or contents require repair or replacement, or if any items are missing, then Company shall have the right, but not the obligation, to repair or replace the items and deduct the costs thereof from Owner's Rental Proceeds or to bill Owner directly. If the cost to repair or replace items for any one month exceeds $500.00, Company at its option can collect the money from the Owner, or it can pay it out of the Reserve for Replacement Fund.

b.  The Owner authorizes Company to make, and to deduct from Owner's Rental Proceeds emergency repairs at cost if, in Company's discretion, such emergency repairs are necessary to protect from damage the interior of the Unit, the interior of the Units or the facilities at the Hotel. The Company shall at all times maintain all keys to the Unit and shall have the right of reasonable inspection of the interior of the Unit in order to satisfy itself that the Unit is being acceptably maintained.

c.  During the term of this Agreement, Company shall cause the Unit to be deep cleaned at Owner's sole cost and expense in order to restore the Unit to as close to "like new"

HLT (FL) FT. LAUDERDALE - MGT AGT

Phoenix/267538.11
{00069115.DOC; 2}

condition as is reasonably possible. The Unit shall be deep cleaned no less than two (2) times a calendar year and no more than four (4) times a calendar year as determined by Company and based on the amount of usage the Unit has experienced. Owner shall be responsible for paying all costs associated with deep cleaning, which costs shall be deducted from sums due and owing from Company to Owner.

d.    The Owner agrees that an amount equal to five percent (5%) of room revenues for each Unit (the "Reserve for Replacement" or "Reserve") shall be withheld from Owner's share of Net Rental Income each month and deposited into a bank account explicitly controlled and set up for this purpose by Company. The amounts in the Reserve shall be used for the repair or replacement of the furnishings and content in the Unit and certain day-to-day operating repairs or replacement of any such items. The funds in the Reserve may also be used to meet obligations under Section 9. There is no guarantee that the Reserve will be sufficient to cover the foregoing costs with respect to the Unit in accordance with the standards for the Hotel. Upon sale of Unit, Owner agrees that the funds being held in Owner's Reserve for Replacement account shall be transferred to the account of the purchaser to pay for future renovations. Company will provide Owner with a final statement for documentation for Owner to claim credit from the purchaser at closing.

6.    **UNIT COSTS, EXPENSES AND ASSESSMENTS.** The Owner agrees to pay, promptly when due, all monthly mortgage payments (if any), real estate taxes, insurance payments, monthly condominium fees, utility cost and expenses, and any condominium assessments. The Owner shall not allow title to the Unit to be encumbered by a lien for non-payment of fees and assessments due to the Association. The Owner shall provide Company with written evidence of payment of all such fees, costs and assessments due and owing as to the Unit. In the event that any expenses, fees and/or assessments due pursuant to this Section 6 are not paid promptly when due, then Company may, in its sole and absolute discretion and without notice or demand upon Owner, but shall not be obligated to, either: (i) withhold Owner's Rental Proceeds until such funds are sufficient to bring the unpaid accounts current, and if and when sufficient funds are available, offset and apply Owner's Rental Proceeds in the possession of Company to the payment of any one or more of such unpaid accounts in such order as Company in its sole and absolute discretion may elect for a fee of five percent (5%) of the amount due; or (ii) terminate this Agreement upon five (5) days prior written notice to Owner. The Company's decision to apply all or any portion of Owner's Rental Proceeds to the payment of any expenses, fees and/or assessments pursuant to this Section 6 shall be made in Company's sole and absolute discretion. In no event whatsoever shall Company be obligated to apply any Owner's Rental Proceeds to the payment of any expenses, fees and/or assessments or to advance any of its own funds for such purposes.

Owner, at its option, may authorize Company to make any or all of the payments for the Unit costs, expenses and assessments described above. Owner shall provide (i) written notification to Company of its election and (ii) the relevant documentation. Company, as an accommodation and without charge to Owner, shall make such payments on a timely basis, provided Owner's credit established under paragraph 10 is in good standing. In no event shall Company be liable to Owner or any third party for any costs, expenses, penalties and the like for failure to make any payment, unless such failure is the result of Company's gross negligence or willful misconduct.

7.    **INSURANCE.** To the extent insurance that complies with the requirements of this Section 7 is not otherwise maintained by the Association. Owner shall, at Owner's expense, maintain in effect throughout the term of this Agreement, such general public liability insurance with minimum limits not less than $1,000,000 per occurrence, property insurance including contents for the full replacement value of the unit including personal contents and other insurance as is required by the Manager or as is otherwise required by Florida law. All policies shall include Company and the Manager as additional insureds with a copy of the endorsement attached to the certificate of insurance. These policies shall apply as primary and non-contributory with respect to any other

HLT (FL) FT. LAUDERDALE – MGT AGT

Page 5

insurance or self-insurance available to Company and Hilton Hotels Corporation.  Owner waives on behalf of its self and it insurers all rights against Company and Manager and its employees for recovery of damages to the extent these damages are covered by its insurance regardless of deductibles, if any.  The requirements contained herein shall not be construed in any manner to relieve or limit Owner's indemnification obligations for any loss or claim arising out this Agreement.  Owner shall further provide certified copies of all insurance polices required within 10 days of Company and Manager's written request for said copies. Such insurance shall be maintained with a financially sound and reputable insurance company deemed reasonably acceptable by Company in its sole discretion. From time to time, upon request, Owner shall deliver to Company and the Manager certificates of insurance evidencing (i) that the above-mentioned insurance is in full force and effect, and (ii) that Company and the Manager shall receive thirty (30) days written notification from each and every insurance company before an insurance policy is canceled for any reason, including, but not limited to, failure by Owner to pay any premium or to renew any insurance policy provided for by this Agreement.  The Owner shall deliver the above-mentioned certificate of insurance to Company on or before the date this Agreement goes into effect and from time to time thereafter upon written request by Company and/or the Manager.  Failure to so deliver such certificates of insurance promptly shall be considered a material breach of this Agreement and Company may, at its option, either terminate this Agreement effective immediately or obtain (but Company shall not be obligated to obtain) the required insurance for Owner. If Company obtains the required insurance on behalf of Owner, Owner shall reimburse Company upon demand for all costs incurred.  If Owner fails to reimburse Company for all costs incurred within thirty (30) days after demand, Company shall have the right to retain Owner's Rental Proceeds until such funds are sufficient to reimburse Owner for all costs incurred, together with interest at the rate of one and one-half percent (1 ½%) per month from the date the expenditure was incurred until Company is reimbursed in full for all costs incurred, without waiving the right to pursue such other remedies against Owner as may be permitted by law.  In the event Company or Manager effects a policy or policies of general public liability, property or other insurance for the Hotel and arranges for the coverage under such policies to include the Owner's Unit, Owner agrees that its Unit shall participate in such insurance program, and Owner agrees Manager shall have the right to charge Owner its prorata share of the premiums charged for such insurance.

8.   **FURNISHING AND EQUIPPING OF UNIT.**  The parties acknowledge that in order for the Unit to be rented to Guests by Company as part of the Hotel, it must contain furniture, accessories, linens and appliances of high quality, style and utility, consistent with the other accommodations offered by Company at the Hotel. Consequently, as additional consideration for entering into this Agreement, Owner agrees, at Owner's sole cost, to maintain in place and in good repair and to upgrade and replace as reasonably required from time to time by Company, the standard furniture, accessories, linens and appliances described on Exhibit A attached to this Agreement.

Additionally, Owner shall maintain the Furnishings Package provided with the Unit by the Company in good repair throughout the term of this Agreement.

9.   **REFURBISHING AND UPGRADES.**  The Unit must at all times be consistent with the other accommodations offered by Company in the Hotel in terms of quality and appearance.  Therefore, as determined from time to time by Company, Owner may be required at Owner's cost, to refurbish the Unit, including replacing, upgrading and/or augmenting furniture, accessories, linens, appliances, curtains, carpeting, wall coverings and other items included in the Furnishings Package.

The Company shall inspect the Unit regularly for compliance with Hotel standards and will notify Owner in writing of any deficiencies, planned refurbishment programs, and/or required upgrades/modifications. The Company will also provide Owner with itemized cost estimates in connection with the work to be performed.  Upon receipt of Owner's approval and a 50% deposit, Operator shall cause the necessary work to be performed and shall oversee the

HLT (FL) FT. LAUDERDALE – MGT AGT

Phoenix/267538.11
{00069115.DOC; 2}

completion of the same on Owner's behalf. The balance of monies owed will be paid promptly by Owner upon completion of the work and receipt by Owner of an itemized bill from Company. If Owner fails to pay such itemized bill within thirty (30) days after receipt of such bill, Company shall have the right to retain Owner's Rental Proceeds until such funds are sufficient to reimburse Owner for all costs incurred, together with interest at the rate of one and one-half percent (1 ½%) per month from the date the expenditure was incurred until Company is reimbursed in full for all costs incurred, without waiving the right to pursue such other remedies against Owner as may be permitted by law.

In the event that Owner does not approve refurbishing, upgrading or modifying the Unit as required, or does not respond to Company's request for approval within thirty (30) days after such request is made, Company may, at its option, terminate this Agreement at any time thereafter without further notice. In the event of termination, Company is only liable for amounts due Owner up to the date of termination.

10. **OWNER'S STANDING CREDIT WITH COMPANY.** In order to assure Owner's timely payment of funds, Owner agrees to maintain a valid credit card authorization on file with Manager at all times as a source of funds. This card will be used to pay all expenses owed that are past due by 30 days from the date of the statement along with the credit card processing fee associated with this charge.

In addition, if Owner, under paragraph 6, elects for Company to pay any of Owner's Unit costs, expenses and assessments and has provided Company the appropriate documentation to make such payments, Company shall make such payments from its own funds.

Company shall mail Owner a copy of the receipt for all charges within thirty (30) days of each such charge. Owner hereby authorizes Company to access the credit established in this paragraph in order to meet Owner's financial obligations under this Agreement.

If the credit card company ever advises Company that it refuses or denies a charge, Company shall notify and invoice Owner for the unpaid amount, and Owner shall reimburse Company within fifteen (15) days of receipt of such invoice. Pending receipt of payment, Company may suspend making payments for or extending credit to Owner.

11. **OWNER'S USE OF THE UNIT.** Owner and Company agree that:

a.    Owner may reserve the Unit for personal use by delivering to Company the Request for Reservation in the form attached to this Agreement as Exhibit B (the "Request for Reservation"), provided that a reservation for the Unit has not been confirmed at the time the Request for Reservation is received by Company. The Owner shall register with Company's on-site office to receive a key to Owner's Unit.

b.    Subject to availability at the time of Company's receipt of the Request for Reservation, Owner may reserve the Unit for personal use for no more than sixty (60) days during November 15 to April 15 of each year, and no more than a total of one hundred and twenty (120) days in any calendar year. The Owner may reserve the Unit for personal use subject to the Unit's availability for the period requested at the time such Request for Reservation is received by Company.

c.    In the event Owner wishes to use the Unit, Company will provide the standard daily housekeeping and cleaning service and supply the standard hotel amenities (such as soap, shampoo, coffee, etc). Owner agrees to pay Company a daily fee equivalent to the then effective rate for the service. If Owner elects not to have such services and amenities, it agrees to have Company provide such services and re-stock the standard amenities upon departure and agrees to pay a departure fee equivalent to the then

HLT (FL) FT. LAUDERDALE – MGT AGT

Page 7

effective rate.   The foregoing fees are subject to such cost-of-living adjustments as Company determines are necessary from time to time.

12.    **COMPLIMENTARY USE OF UNIT.** In an effort to continue to promote rental of the Unit and to familiarize representatives of the company, travel agencies, airlines and other organizations with the Unit, complimentary use of the Unit, without charge or expense, may be permitted from time to time in the sole discretion of Company.

13.    **RULES, REGULATIONS AND STANDARDS.** The Owner shall at all times abide by and comply with all rules and regulations established from time to time by Company and/or the Manager.  The Owner shall also ensure, at Owner's sole cost and expense, that the Unit shall at all times comply with all standards established from time to time by the Manager and with all inspection reports and product improvement plans issued from time to time by the Manager.

14.    **LIMITED POWER OF ATTORNEY.**  The Owner does hereby irrevocably name, constitute and appoint Company, its legal representatives, successors and assigns as Owner's attorney-in-fact for the term of this Agreement for the limited purposes of (i) providing Guests with full access to all common areas associated with the Unit, (ii) causing Unit maintenance activities required of Company to be undertaken promptly, (iii) issuing and signing confirmed reservations for the Unit and (iv) taking any action, that may be lawfully permitted and required to evict any Guest. This power of attorney is specifically limited to the above areas and is valid only when circumstances prevent Owner from representing Owner's interest in a timely manner.

15.    **ASSIGNMENT BY COMPANY.**  The Company may assign this Agreement without Owner's consent to any affiliate of Company or to any successor operator of the Hotel.

16.    **STORAGE OF PERSONAL PROPERTY.**  The Owner shall not store or leave any property in the Unit except items that may be securely and properly stored in the Unit's designated locked Owner's closet, if one exists.  The Company assumes no responsibility or liability for items stored by Owner in the Unit, whether or not such items are stored in designated locked Owner's closet.

17.    **DEFAULT BY OWNER.**  If Owner shall default in the performance of Owner's obligations under this Agreement or fail to abide by the rules and regulations established from time to time by Company and/or Manager, including any bylaws or documents of the Association, and such default shall continue thirty (30) days after Owner's receipt of written notice from Company detailing the default in question, Company may, in addition to all other remedies available to Company at law, terminate this Agreement and/or temporarily cease its efforts to rent the Unit pursuant to this Agreement until such time as Owner has cured the default or satisfied the deficiency; provided, however, if, as a result of such default, the Unit is not in a condition suitable for rental, Company may immediately cease renting the Unit until such time as Owner's default is cured at Owner's expense.

18.    **DEFAULT BY COMPANY.**  If Company shall default in the performance of its obligations under this Agreement and shall fail to cure such default within sixty (60) days after Company's receipt of written notice from Owner detailing the default in question, Owner may, as its sole and exclusive remedy, terminate this Agreement by delivery to Company of a written termination notice at any time prior to the date that Company has cured the default in question.

19.    **MANAGEMENT AND OPERATION OF THE HOTEL.**  Owner acknowledges that Company has entered, or will enter, into the HMA and Owner hereby consents to and approves that Company has entered into such agreement.  In consideration of, and as a material inducement for, Company's execution of such agreement and other matters relating to Hotel, Owner agrees, during the term of this Agreement, that Owner will not take any action to terminate, or cause the termination of, the HMA, and as to all matters and meetings relating to the Hotel in which Owner has the right to consent to and/or to vote, Owner will, during the term of this Agreement,

HLT (FL) FT. LAUDERDALE – MGT AGT

Page 8

consent to and vote in favor of: (i) Company's management of the Hotel; (ii) Company's operation of the Hotel as the Hotel in accordance with the requirements of the HMA; (iii) the Association's execution and delivery to Company and/or the Manager of any guaranty agreement required pursuant to or in connection with the HMA; and (iv) the Association's reimbursement to Company of all penalties and charges incurred by Company in connection with the HMA.

20. **NO GUARANTEED RENTAL.** OWNER ACKNOWLEDGES THAT THERE ARE NO RENTAL INCOME GUARANTEES OF ANY NATURE, NO POOLING AGREEMENTS WHATSOEVER, AND NO REPRESENTATIONS OTHER THAN WHAT IS CONTAINED IN THIS AGREEMENT. NEITHER COMPANY NOR MANAGER GUARANTEES THAT OWNER WILL RECEIVE ANY MINIMUM PAYMENTS UNDER THIS AGREEMENT OR THAT OWNER WILL RECEIVE RENTAL INCOME EQUIVALENT TO THAT GENERATED BY ANY OTHER UNIT IN THE HOTEL. FURTHERMORE, OWNER UNDERSTANDS AND ACKNOWLEDGES THAT NEITHER MANAGER, NOR ITS SUBSIDIARIES, OR PARENT COMPANY HAS ANY OWNERSHIP INTEREST IN THE HOTEL. IN ACTING UNDER THIS AGREEMENT, COMPANY IS ACTING SOLEY ON BEHALF OF, AND AS REPRESENTATIVE FOR, OWNER.

21. **OWNER'S ACKNOWLEDGEMENT.** THE OWNER UNDERSTANDS AND ACKNOWLEDGES THAT EXECUTION OF THIS AGREEMENT AND PARTICIPATION IN THE RENTAL MANAGEMENT PROGRAM AT THE HOTEL IS OPTIONAL AND IS NOT A REQUIREMENT OF OWNERSHIP OF THE UNIT. THE OWNER FURTHER ACKNOWLEDGES THAT NEITHER THE COMPANY NOR MANAGER, OR ANY OF THEIR RESPECTIVE OFFICERS, REPRESENTATIVES, EMPLOYEES, AGENTS, SUBSIDIARIES, PARENT COMPANY AND AFFILIATES HAS (I) MADE ANY STATEMENTS OR REPRESENTATIONS WITH RESPECT TO THE ECONOMIC OR TAX BENEFITS OF OWNERSHIP OF THE UNIT; (II) EMPHASIZED THE ECONOMIC BENEFITS TO BE DERIVED FROM THE MANAGERIAL EFFORTS OF THE COMPANY OR FROM PARTICIPATION IN THIS RENTAL MANAGEMENT PROGRAM; OR (III) MADE ANY SUGGESTION, IMPLICATION, STATEMENT OR REPRESENTATION, THAT ANY POOLING ARRANGEMENT WILL EXIST WITH PARTICIPANTS IN THIS PROGRAM OR THAT OWNER WILL SHARE IN ANY WAY IN THE RENTAL PROCEEDS OF OTHER UNIT OWNERS IN THE HOTEL.

22. **SALE OF UNIT.** Owner shall inform Company and Manager in writing if the Unit is to be put up for sale. The Unit cannot be shown for sale during periods of rental occupancy and any sale of the Unit must be subject to confirmed reservations for occupancy of the Unit and the provisions of this Agreement. Subject to the foregoing, this Agreement may be terminated upon the transfer of the Unit (by sale, foreclosure or otherwise) by notice to Agent of such sale. Until so terminated, this Agreement shall continue in full force and effect with the new owner. This Agreement shall automatically be deemed subordinate to any institutional first mortgage now or hereafter placed on the Unit, and as such, this Agreement shall not survive the foreclosure of any mortgage by any such "Institutional First Mortgagee". For the purposes hereof, an Institutional First Mortgagee means a bank, savings and loan association, insurance company, real estate or mortgage investment trust, pension fund, an agency of the United States Government, mortgage banker, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation or any other lender generally recognized as an institutional lender, holding a first mortgage on the Unit.

23. **MISCELLANEOUS PROVISIONS.** This Agreement shall be subject to and contingent upon the following:

   a.   The Owner agrees to indemnify and hold Company and Manager, and their respective officers, representatives, employees, agents, subsidiaries, parent company and affiliates free and harmless from any and all claims, losses, demands, damages, liabilities, costs and expenses (including, without limitation, attorneys fees, judgments, fines and amounts paid or to be paid in settlement) arising from, related to, or in connection with this Agreement or the use and occupancy of the Unit.

HLT (FL) FT. LAUDERDALE – NOT AGT

b.  Neither Company nor Manager, nor any of their respective officers, representatives, employees, agents, subsidiaries, parent and affiliates shall be liable for any loss or damage to any person or property, including, but not limited to, Owner, the Guests, the Unit and its equipment, furnishings and appliances, of any nature resulting from any accident or occurrence in or upon the Unit, the building in which the Unit is a part of the Hotel, including but not limited to, any and all claims, demands, damages, costs and expenses (including, without limitation, attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) resulting from: (i) the acts or omissions of Guests; (ii) wind, rain or other elements; or (iii) theft, vandalism, fire, force majeur or act of God.

c.  The parties hereto agree and acknowledge that this Agreement constitutes the entire Agreement between the parties and there are no oral or written amendments, modifications, other agreements or representations.

d.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. Any litigation arising out of this Agreement shall be brought in a court of competent jurisdiction located in Broward County, Florida.

e.  Recognizing the fact that there may be several Owners of a single Unit, it is hereby agreed that Owner's designate, as listed on the front page of this Agreement, shall have the authority to issue any and all instructions to Company, and Company shall act in reliance thereon.

f.  If any clause or provision of this Agreement shall be held invalid or void for any reason, such invalid or void clause or provision shall not affect the whole of this Agreement and the balance of the provisions of this Agreement shall remain in full force and effect.

g.  In the event that it becomes necessary for either party to this Agreement to incur legal fees and expenses for the enforcement of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, legal assistant fees and costs, including fees incurred whether or not suit is brought, and fees and costs incurred during any appeals, bankruptcy proceedings and/or administrative proceedings.

h.  Any notice or demand required under this Agreement or by law shall be in writing and shall be deemed effective upon receipt if sent by personal delivery, upon one (1) business day if sent by express overnight delivery with a nationally recognized courier service (such as Federal Express) or three (3) business days after having been sent by US mail, certified mail, return receipt requested and addressed to the parties at the addresses set forth below. Either party may change such addresses with written notice to the other party.

| COMPANY: | OWNER: | OWNER's Designate: |
|---|---|---|
| Q CLUB HOTEL, LLC.<br>505 North Ft. Lauderdale Beach Blvd<br>Fort Lauderdale, FL 33304 | FRED + STACY BURGESS<br>985 Marina Dr.<br>Weston FL 33327 | |
| Telephone: (954) 760-7177 | Telephone:<br>954-659-3199 | Telephone: |
| Fax No.: (954) 760-9771 | Fax No.:<br>954-727-0303 | Fax No.: |

i.  The Owner represents and warrants to Company that Owner has the full authority to enter into this Agreement, and that there is no other party with an interest in the Unit whose joinder in this Agreement is necessary.

HLT (FL) FT. LAUDERDALE – MGT AGT

Page 10

Phoenix/267538.11
{00069115.DOC;2}

j.      For all purposes of this Agreement it shall be understood that time is of the essence.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth above.

Signed and delivered in the presence of:

COMPANY:  Q CLUB HOTEL, LLC                    OWNER:

By:      Hilton Hotels Corporation,
         Manager

By:
         Signature                             Signature

         Andreas Ioannou                       Name (please print or type)  STACY BURGESS
         Name (please type or print)

         General Manager
         Title

Date signed: 1/30/07                           Date signed: 1/4/07

Phoenix/267538.11
{00069115.DOC; 2}

# Exhibit

# "B"



# OWNER ORIENTATION GUIDE



**Hilton**
Fort Lauderdale Beach Resort

It has been an exciting twenty two months since the opening of Hilton Fort Lauderdale Beach Resort, on January 20, 2007. Our hotel has established itself as one of the leading hotels in Fort Lauderdale, and we are looking forward to even better times ahead. Please allow me this opportunity to provide an update on our progress and the exciting projects that we have completed as well as the ones planned for the future:

* ilios restaurant was totally renovated in May 2008; the new design has received great comments from our guests. Executive Chef Sean McDonald's new Tapas dinner concept has received great reviews and a 3.5 star rating from the Miami Herald.
* The Sunrise Terrace, 6th floor, has been significantly upgraded with new chaise lounge chairs, new umbrellas, new private cabanas, new sitting areas and a new towel/service kiosk.
* ilios terrace has been enhanced with a covered area including five attached cabanas for al fresco dining.
* All exterior landscaping has been enhanced on the first and sixth floors that added a lively appearance to the Resort.
* Le Marche, our oceanfront gourmet market and bakery, has opened recently and features Starbucks coffee, panini, gelato, crepes, salads, market items and pastries. This is a great addition for our Resort guests, local residents and people on the beach.
* Aquaknox, our oceanfront signature restaurant, is awaiting approval from the City of Fort Lauderdale; expected to open beginning of 2009.
* Spa Q will be enhanced with four outdoor treatment rooms that we estimate to be completed by the end of the year.
* We received our "Green Hotel" certificate from the State of Florida in April of this year; we are the first and only hotel on Fort Lauderdale Beach to receive this certification.
* Our standards of service and quality of product have allowed us to be awarded the AAA Travel Four Diamond Award for the second year in a row; as a side note, there are no Five Diamond hotels in Broward County as of today.

As we are approaching the third year of operation we had an opportunity as a Team to evaluate the market conditions and develop strategies for us to maximize guest loyalty and the returns for all entities involved. We have solidified a business and marketing plan that would position us correctly to achieve that success.

One of our business objectives in these economic times is to increase our group market; we are internally working on different options to expand our meeting facilities and ultimately our occupancy levels. We are also planning to increase our participation with city wide groups that typically book their business years out as well as with individual groups and companies that are asking for multiple year contracts. This is a common practice in our industry that most hotels have followed for years.

In order to commit to this type of business, we need to know our room availability several years in advance, which includes knowing how many units at the Resort, will be participating in the Unit Management Agreement. (Currently, 99% of the units participate.) The term of our new Unit Management Agreement, which is enclosed for your review and consideration, therefore now runs for five (5) years and can be cancelled if the Unit is sold. There are a number of other changes in the agreement, which you should review carefully. In addition to contributing their units to the rental program, participating Owners will be entitled to the following benefits:

- 10% Discount for Food and Beverage at ilios and Sunrise Terrace
- 10% Discount at Spa Q
- 10% Discount on Food and Beverage for private events
- 25% Discount on best available rate for friends and family accommodations accompanying owners in residence
- Q Club membership privileges while not in residence
- Preferred membership rates and tee times at Parkland Private Country Club

Additionally all owners that will sign and return the agreement by January 15, 2009 will receive a credit of **$3,850** as follows:

- A $2,500 credit towards shared costs issued at the close of the 4th Quarter 2009
- A $500 Resort credit that can be applied anywhere in the Resort's ilios Restaurant, Le Marche or Spa Q; the credit must be used by the end of 2009
- The $850 enrollment fee will be waived

In closing, should I personally be of any assistance or our Owner Relations Manager, Whitney Gibbs, please do not hesitate to contact us directly.

We are looking forward to our continued successes.

Sincerely,

Andreas A. Ioannou
General Manager



**Hilton**
Fort Lauderdale Beach Resort

# TABLE OF CONTENTS

### General Information & Services

Arrival & Check-In ........................ 1
Parking ....................................... 1
Telephone & Internet ...................... 1

In-room Dining .............................. 2
Grocery Service ............................. 2
Catering & Special Events ................ 2

Business Center ............................. 3
Hilton Fitness by PRECOR USA® ....... 3
Spa Q ......................................... 3
Cabanas ...................................... 3
Transportation .............................. 3
Storage ....................................... 3

Security & Key-Card ....................... 4
Electricity ..................................... 4
Fire & Safety ................................. 4

### Owner Services

Owner Relations Office ................... 5
Reservations ................................. 5
Occupancy ................................... 5

Housekeeping ............................... 6
Suite Maintenance & Repairs ........... 6
Incidental Room Charges ................. 6

# APPENDIX

Suite Maintenance Service ............... 7
Special Maintenance Services ........... 7

Housekeeping Services ................... 8
Deep Cleaning .............................. 8

Unit Management Agreement (Sample) ... 9



**Hilton**
Fort Lauderdale Beach Resort

## GENERAL INFORMATION & SERVICES

## ARRIVAL & CHECK-IN

The Hilton Fort Lauderdale Beach Resort offers you a lifestyle and experience that will take care of your every wish from the moment you arrive through to your departure.

Upon Arrival, please Check-in at the Front Desk so that we may provide you with an Electronic Key Card for your Suite.

If you require any assistance prior to arrival please feel free to contact Guest Assistance.

Established check-in time for Resort Program Members is currently **3:00 P.M.** and checkout time is **11:00 A.M.**, subject to change.

## PARKING

The Hilton Fort Lauderdale Beach Resort offers Valet Parking Service exclusively. As a Suite Owner, you will receive complimentary Parking for one car while you are in residence. Additional vehicle parking is $29 for an overnight stay. Any Guest(s) of a Unit Owner will be required to pay $29 for parking per day while in residence.

Contact Guest Assistance to arrange delivery of your car to the main Resort entrance.

*(Applicable Taxes will be added. / Rates are subject to change at any time without advance notice.)*

## TELEPHONE & INTERNET

The Hilton Fort Lauderdale Beach Resort is equipped with a state of the art telephone system as well as Wireless Internet. Broadband Internet access is $12.95 for twenty-four (24) hours. All telephone charges will be on an individual basis.

*(Applicable Taxes will be added. / Rates are subject to change at any time without advance notice.)*

1

## IN-ROOM DINING

Experience world class dining in the comforts of your Suite. Please contact In Room Dining to place your order.

Our Culinary team will be delighted to prepare a personalized menu for you and your guests in the intimacy of your Suite. Reservations recommended based on menu selection.

In Room Dining is available 24 hours.

## GROCERY SERVICE

Upon request, we can provide an extensive grocery list with your choice of unique social foods and beverages and fresh and distinct ingredients for individual, couple or family enjoyment.

## CATERING & SPECIAL EVENTS

When planning larger events, please contact our team of professionals to make your next event unique and memorable.

The Catering office is located in the Executive Offices on the 1st Level.

## BUSINESS CENTER

While away from the office, our business center can provide you with a comfortable location to work and access the Internet for a fee. Photocopying and Facsimile services are also available.

The Business Center is located on the 2nd Level.

## HILTON FITNESS by PRECOR USA

Equipped with a fine selection of Precor Machines, our Fitness Center can help keep you on your training schedule during your stay.

The Fitness Center is located on the 6th Level.

## SPA Q

SPA Q is located on the 6th Level.

## CABANAS

Private Cabanas are available for a fee on the Sunrise Terrace, which is located on the 6TH Level. Please contact Guest Assistance to make a reservation.

## TRANSPORTATION

Should you require transportation, please contact Guest Assistance to arrange for Airport Shuttle, Taxi, or Limousine services.

## STORAGE

You may, at your own risk, leave personal items within your Suites Owner's closet.

Some items that are restricted from storage in the Owner's Closet are Food, Hazardous Materials, Contraband, Combustibles, or any item that may pose a Danger to guests.

## SECURITY & ELECTRONIC KEY SYSTEM

The Hilton Fort Lauderdale Beach Resort has security throughout the Resort.

All Suites are furnished with an electronic key system for added security. Should you encounter any problems with your key-card, please contact the Front Desk.

## ELECTRICITY

Electrical service for your suite is provided by Florida Power and Light (FPL). Contact information to establish an account with FPL is provided below.

**Online**
The FPL web site is www.FPL.com. You will be applying for Residential Service.

**Telephone**
Please call (954) 797-5000. Let the FPL agent know you need to establish Residential Service.

For those enrolling in the Resort Program, please complete the FPL utility cost and expenses deduction authorization form. By doing so we will be able to pay your Florida Power and Light (FPL) statement from your Suite's owner revenue.

## FIRE & SAFETY

Please familiarize yourself with the exits nearest to your residence and the fire alarm locations on your floor. Emergency procedures are located behind your front door.

In case of an emergency please depress the red quick dial button located on your phone or dial 911.



**OWNER SERVICES**

## OWNER RELATIONS OFFICE

The Owner Relations Office of the Hilton Fort Lauderdale Beach Resort is your primary point of contact as a Suite Owner.

Our office also administers the voluntary Resort Program for Suite Owners.

Hilton Owner Relations however, is not affiliated with the condominium association or the developer.

Suite Owners can contact Owner Relations, at **(954) 414-2680.** You may also email us at OR_FLLFS@HILTON.COM. Our hours of operation are Monday thru Friday from 8am to 6pm.

## RESERVATIONS

Reservations are required for those participating in the Resort Program. If you would like to reserve your Suite for personal use, please contact Owner Relations via **Fax** at **(954) 414-2223** or via **email** at OR_FLLFS@hilton.com. Please provide the following information when making a reservation:

- o Suite #
- o Arrival / Departure Date
- o Arrival Time
- o Name of Occupant(s)
- o Number in Party
- o Signed Affidavit verifying that no monies are being received by Unit Owner for guest(s) stays.
- o Transportation Needs
- o Any Comments or Special Instructions.

## OCCUPANCY

In accordance with the terms of the resolution and section 47-12 of the ULDR of the City of Fort Lauderdale, Florida referred to in Section 2 of the resolution, occupancy of each unit shall be restricted as follows:

> *"No guest (including unit owners) of the Hotel shall be provided with lodging for more than sixty (60) days during November 15th to April 15th of each year, and no more than a total of one hundred and twenty (120) days in any calendar year"*

5

## HOUSEKEEPING

The Resort offers twice daily Housekeeping services. While in residence, Housekeeping will attend to your Suite for a fee upon request.

For those Owners who are members of the Resort Program, while in residence, Housekeeping will attend to your Suite for a fee automatically. Should you choose not to have Housekeeping services, please contact Guest Assistance, and we will suspend service.

Please refer to the **Appendix** for a list of Housekeeping services and prices for the Resort Program Members and non-Members.

## SUITE MAINTENANCE & REPAIRS

Our Engineering Team is ready to assist you with maintaining your suite in excellent condition. The Resort offers Suite Maintenance services for a fee which are detailed in the **Appendix**.

For those Owners in the Resort Program, we strive to maintain the Suites in our care to the highest standards of quality. The Suites are inspected on an ongoing basis and repairs and maintenance are performed as needed. Some Suite Maintenance services may have an associated fee, please see the **Appendix** for further information.

## INCIDENTAL ROOM CHARGES

Room Charges for incidentals are charged to the registered guest's credit card when a ceiling of $2,000.00 is reached or if their stay reaches or exceeds 7 days. Authorizations for room charges are performed on a weekly basis for outstanding balances.

6

JUN-16-2009  16:32


Hilton
—Fort Lauderdale Beach Resort

**APPENDIX**

# APPENDIX

## Special Maintenance Service

For all trade services such as plumbing, plaster and painting, wallpapering, air conditioning repairs, electrical work, and carpentry (excluding materials).

> Resort Program Members:        $50/hour (minimum 1 hour)
> Resort Program Non-Members:    $100/hour (minimum 1 hour)

> *(Upon owner's request, hotel will provide materials at cost plus 30% for overhead expenses.)*

The Resort will charge owners a supervisory fee to oversee outside contractor work during the owner's absence to ensure no contractors are left unattended in the Suite and, that upon completion of scheduled work, the service work has been completed properly

> Resort Program Members:        Complimentary
> Resort Program Non-Members:    $200/per day

> (All Work must be performed between 9:00 AM and 5:00 PM for all days of the week)
> (No work may be performed during holidays.)

> *(Applicable Taxes will be added. / Rates are subject to change at any time without advance notice.)*

{007848-999994 00139377.DOC; 1}

7

## APPENDIX
### Housekeeping Services

Housekeeping Services consist of Twice Daily cleanings. While in residence, Housekeeping will attend to your Suite for a fee upon request.

For those Owners who are members of the Resort Program, while in residence, Housekeeping will attend to your Suite for a fee automatically.   Should you choose not to have Housekeeping services, please contact Guest Assistance, and we will suspend service.

Resort Program Members

| Room Types | Daily Rate / Departure Fee |
|---|---|
| Three Bedroom Suite | $ 175.00 |
| Two Bedroom Suite | $ 90.00 |
| One Bedroom Suite | $ 65.00 |
| Studio | $ 55.00 |

Resort Program Non-Members

| Room Types | Daily Rate / Departure Fee |
|---|---|
| Three Bedroom Suite | $ 350.00 |
| Two Bedroom Suite | $ 180.00 |
| One Bedroom Suite | $ 130.00 |
| Studio | $ 110.00 |

*(Applicable Taxes will be added. / Rates are subject to change at any time without advance notice.)*

### Deep Cleaning

In an effort to maintain the quality of your Suite, special cleaning projects are offered routinely throughout the year for a fee. Our Resort Program members are automatically incorporated into the schedule, and non-members may elect to have there Suite serviced as well.

The schedule of cleaning depends on the occupancy, age of the furniture and fixtures, and general wear and tear on the room.

Throughout the course of the year, the minimum corporate standard of two cyclic cleanings needs to be completed for Resort Program Members.

Resort Program Members

| | |
|---|---|
| Three Bedroom Suite | $575.00 |
| Two Bedroom Suite | $475.00 |
| One Bedroom Suite | $375.00 |
| Studio | $275.00 |

2

Resort Program Non-Members

| | |
|---|---|
| Three Bedroom Suite | $1150.00 |
| Two Bedroom Suite | $950.00 |
| One Bedroom Suite | $750.00 |
| Studio | $550.00 |

*[Applicable Taxes will be added. / Rates are subject to change* at any time without advance notice.]

3

{007848-999994 00139377.DOC; 1}

10

# UNIT MANAGEMENT AGREEMENT

This UNIT MANAGEMENT AGREEMENT (this *Agreement*) is made and entered into this _16_ day of _DECEMBER_, 200 8 (the *Effective Date*) by and between Q Club Hotel, LLC, a Florida limited liability company (*Hotel Owner*), and the owner(s) identified below (individually or collectively and jointly and severally *Unit Owner*).

Hotel/Resort:  Hilton Fort Lauderdale Beach Resort

Owner Unit Number:  _1401._

Name of Unit Owner: _WILLIAM DOUGLAS MCKENZIE._

Mailing Address of Unit Owner:

_736 N.E. 17th WAY._

_FT. LAUDERDALE._

_FLA  33304._

*If there are multiple Unit Owners, a list of the names and contact information for all Unit Owners must be attached to this Agreement.*

Primary Telephone Number: _954  527  2883._

Alternate Telephone Number: _914  497  9553._

E-mail Address: _WDMCK @ HOTMAIL.COM._

SS#/EIN: _263 - 77 - 2752._

Unit Owner's Designate: _____
*If there is more than one Unit Owner or Unit Owner desires to designate another person who is authorized to act on Unit Owner's behalf*

## BACKGROUND

A.      Unit Owner is the owner of, or will acquire ownership of, the condominium unit identified above (the *Owner Unit*) in the condominium project known as "Q-Club Resort and Residences Condominium" (the *Condominium*) located in Fort Lauderdale, Florida.   The Condominium has been established pursuant to one or more declarations of condominium and declarations of covenants, conditions and restrictions (together with all bylaws, rules and regulations issued thereunder, the *Declarations*) which have been or will be recorded in the county records of the county in which the Hotel is located.

B.      The Condominium has been established and created in a building, a portion of which is comprised of a hotel owned by Hotel Owner known as the Hilton Fort Lauderdale Beach Resort (the *Hotel*).

4

{007848-999994 00139377.DOC; 1}

C.     Hotel Owner or its delegates will manage the Hotel and a voluntary rental program for some of the units in the Condominium and other hotel rooms (collectively, the *Hotel Units*) for purposes of making the Hotel Units available to third parties for transient lodging as part of the Hotel operation.

D.     Unit Owner desires to make the Owner Unit available for participation in the Rental Program and to engage the services of Hotel Owner or its designate as the exclusive rental agent to offer the Owner Unit for rental under the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the terms, conditions and the mutual covenants herein set forth, the parties agree as follows:

1.     **DEFINITIONS.**  Capitalized terms will have the meanings set forth below or as defined elsewhere in this Agreement.

a.     *Hotel Guest* means any person or persons who rent the Owner Unit, including complimentary guests, but excluding Unit Owner, Unit Owner's immediate family, and Personal Guests.

b.     *Personal Guest* means a personal guest of Unit Owner occupying the Owner Unit on the authorization of Unit Owner without payment or other consideration to Unit Owner.

c.     *Unit Owner* means the owner of the Owner Unit and members of his or her immediate family.

2.     **RENTAL AGENT.**

a.     Exclusive Agency.  Unit Owner hereby engages Hotel Owner as its sole and exclusive agent to rent, manage, and control the Owner Unit during the Term (as defined in Section 3 below), subject to the terms and conditions set forth in this Agreement. Hotel Owner agrees to act as Unit Owner's exclusive rental agent for the Owner Unit, subject to the terms and conditions of this Agreement.  Unit Owner shall not rent the Owner Unit except through the Hotel Owner and agrees to refer all rental inquiries to Hotel Owner.  Nothing in this Agreement is intended to or does constitute a partnership or joint undertaking between Unit Owner and Hotel Owner, and the relationship established in this Agreement is solely that of an owner of real property and an agent.

b.     Delegation or Assignment by Hotel Owner.  Unit Owner acknowledges and agrees that Hotel Owner may assign or delegate its rights and obligations under this Agreement, in whole or in part, and in Hotel Owner's sole discretion, without notice to or consent from Unit Owner, to (i) the operator of the Hotel from time to time, if any (the *Hotel Operator*), (ii) an affiliate of Hotel Owner, (iii) any third party designated by Hotel Owner, or (iv) a successor Hotel Owner.  If the agreement by which this Agreement is assigned by Hotel Owner, or pursuant to which the responsibilities of Hotel Owner are delegated, expires or otherwise terminates so that the assignee or delegate is no longer associated with the Hotel then, at Hotel Owner's election (a) Hotel Owner may terminate this Agreement upon delivery of notice to Unit Owner, or (b) this Agreement may be assigned to Hotel Owner, another Hotel Operator engaged for the Hotel, or other person or entity designated by Hotel Owner, in which event the Hotel Owner or such other Hotel Operator, person or entity will perform the functions of the Hotel Owner hereunder.

Unit Owner acknowledges that **there is no guarantee that:**

- Any agreement for management of the Hotel will remain in place for the stated duration of this Agreement

5

- The Hotel, this Agreement, or the Rental Program (as defined in Section 4 below) will be managed by any particular Hotel Operator or any other operator for the duration of the Term

- Any person or entity to which Hotel Owner assigns or delegates its rights and obligations under this Agreement may, but shall not be required to, be experienced in the operation of hotels of the same class as the Hotel

- Any Hotel Operator may impose standards for the operation of the Hotel which shall become the "Hotel Standards" as discussed in Section 8 below

3.    **TERM.** The *Term* of this Agreement shall be the Initial Term together with all Renewal Terms, determined as follows:

a.    Initial Term.  The initial term of this Agreement shall commence as of the Effective Date and sixty (60) months thereafter, unless terminated earlier as provided in this Agreement (the *Initial Term*).

b.    Renewal Term.  Upon the expiration of the Initial Term, this Agreement shall be automatically renewed for additional terms of sixty (60) months each (each a *Renewal Term*) unless Unit Owner or Hotel Owner, at least twelve (12) months prior to the expiration date of the Initial Term or then current Renewal Term (as applicable), gives written notice to the other party of its desire not to renew this Agreement.

c.    Special Termination Right.  Notwithstanding the other provisions of this Section 3, (i) Hotel Owner shall have the right to terminate this Agreement, in its sole and absolute discretion and whether with or without cause, upon sixty (60) days' prior written notice to Unit Owner; and (ii) Hotel Owner shall have the right, in its sole and absolute discretion, to terminate this Agreement upon fifteen (15) days' prior written notice to Unit Owner if less than 250 Hotel Units are then participating in the Rental Program.

4.    **RENTAL PROCEDURES.**  Hotel Owner shall use commercially reasonable efforts to rent the Owner Unit to Hotel Guests in accordance with the following provisions (Rental Program):

a.    Setting Rates.  Hotel Owner has the right to establish and adjust, from time to time the rental rates for the Owner Unit without notice to or consent of Unit Owner, and to rent the Owner Unit for the rates that Hotel Owner considers appropriate, in its discretion, based upon occupancy levels, seasonal demand, changes in operating costs, rates of competitive properties, prevailing market conditions and other conditions and matters considered relevant by Hotel Owner.

b.    Rental Rotation.  Hotel Owner agrees to rent the Owner Unit in accordance with a fair and equitable process to be established by Hotel Owner from time to time to ensure that all of the Hotel Units in the Rental Program are fairly and equitably offered for rental.  In renting out Hotel Units participating in the Rental Program, Hotel Owner may take into account (i) requests of Hotel Guests, (ii) factors which differentiate Hotel Units within the Rental Program, such as size, location, view, type of unit, and other relevant factors, and (iii) a priority rental preference with respect to Hotel Units owned by Hotel Owner and Hotel Units complying with access and use requirements imposed by the Americans with Disabilities Act (*ADA Compliant Units*).  Rental of ADA Compliant Units may be undertaken without regard to whether or not the Hotel Guest using such ADA Compliant Unit has a condition which necessitates occupancy of an ADA Compliant Unit.

c.    All Reservations to be Made Though Hotel Owner.  All reservations, including Unit Owner referrals, must be made through Hotel Owner.  Unit Owner shall schedule use of the

6

Owner Unit by Unit Owner or its Personal Guest with Hotel Owner in accordance with the requirements of this Agreement. Hotel Owner shall not be required to notify Unit Owner of existing reservations except by specific request. Neither Unit Owner nor any Personal Guest of Unit Owner will be able to occupy, use or enter the Owner Unit for any period of time without a confirmed reservation or during periods of time when the Owner Unit has been rented to Hotel Guests.

    d.    No Assurances of Rental. **UNIT OWNER ACKNOWLEDGES THAT DESPITE THE EFFORTS OF HOTEL OWNER, THE OWNER UNIT MAY NOT BE RENTED FOR THE SAME OR SUBSTANTIALLY THE SAME NUMBER OF NIGHTS AS OTHER HOTEL UNITS IN THE RENTAL PROGRAM FOR ANY TIME PERIOD. BOTH THE ABILITY OF THE HOTEL OWNER TO RENT HOTEL UNITS AND THE SELECTION OF A PARTICULAR UNIT WITHIN THE RENTAL PROGRAM FOR RENTAL WILL BE SUBJECT TO, AMONG OTHER THINGS, THE PREFERENCES OF HOTEL GUESTS.**

    e.    Complimentary and Promotional Use. Hotel Owner shall have the right to use the Owner Unit for promotional and other complimentary purposes in Hotel Owner's sole and absolute discretion Hotel Owner shall endeavor to equitably allocate such use among all Hotel Units in the Rental Program. Hotel Owner shall not charge a rental rate for the complimentary use of the Owner Unit and no rental income shall be paid to Unit Owner with respect to such use. In addition, Hotel Owner shall have the right to rent the Unit using rental packages which include other amenities and/or services (e.g., spa packages), and, in any such event, only that portion of the rental package attributable to rental for the Unit, as determined by the Hotel Owner based on its standard pricing practices, shall be included in the determination of Gross Unit Revenues (as defined in Section 5.b. below).

    f.    Hotel Guest Satisfaction. Hotel Owner shall have the right, in its sole and absolute discretion, to grant Hotel Guests a discount of up to 100% of the gross rent in the event any repairs of the Owner Unit are required during the period of occupancy or as may otherwise be necessary to resolve Hotel Guest satisfaction issues. The Hotel Owner shall also have the right, in its sole discretion, to transfer the Hotel Guest to another Hotel Unit in the event the rebate is unacceptable to the Hotel Guest; provided that Unit Owner shall be paid a pro rata portion of the rent for the period in which Hotel Guest occupied the Owner Unit.

5.    **PAYMENTS TO THE UNIT OWNER AND THE HOTEL OWNER**

    a.    Split of Net Rental Income. Net Rental Income will be split between Unit Owner and Hotel Owner as follows:

        Unit Owner    45% (the *Unit Owner's Rental Proceeds*)

        Hotel Owner    55% (as a fee for its services rendered under this Agreement)

    b.    Calculation of Net Rental Income. Net Rental Income shall mean gross rental revenues collected from the rental of the Owner Unit, net of discounts, rebates, credits, and occupancy, sales and related taxes, less fifteen percent (15%) of such revenues for fees and commissions.

    c.    Enrollment Fee. Upon the execution of this Agreement, Unit Owner shall pay to Hotel Owner a one-time, non-refundable fee in the amount of $850.00, to be applied to the purchase of disposable operating supplies and amenities customary to an upscale property required by the Hotel Owner in order for the Owner Unit to meet the standards for rental to the transient public. Upon the sale of the Owner Unit, the new Unit Owner will be responsible for replacement of missing or worn items, to be determined by inspection of a Hotel Owner representative after closing.

7

{007848-999994 00139377.DOC; 1}

d.      Reports/Distributions.   Within thirty (30) days after the end of each calendar quarter, Hotel Owner will deliver to Unit Owner a statement (the *Unit Owner Statement*) for the Owner Unit that reflects, among other things, the Gross Unit Revenues, an itemization by general category of all deductions from Gross Unit Revenues used in determining Net Rental Income, and Unit Owner's share of Net Rental Income for the applicable Unit Owner Statement Period.  If the Unit Owner Statement indicates that a distribution is due to Unit Owner, Hotel Owner will remit to Unit Owner such distribution within ten (10) business days after the date of such Unit Owner statement.  If the Unit Owner Statement indicates that payment is due to Hotel Owner, Unit Owner must remit to Hotel Owner the payment reflected in such Unit Owner Statement within ten (10) business days after the date of such Unit Owner Statement.  If Unit Owner fails to make any such payment as and when such payment is due and payable, Unit Owner shall be obligated to pay to Hotel any late fees, finance charges or other costs imposed from time to time by Hotel Owner.

e.      Deduction from Payments.   The payments due under Section 6, 7, and 8 may, at the election of Hotel Owner, be deducted from Unit Owner's Rental Proceeds and applied by Hotel Owner for the purpose for which such payment is required pursuant to this Agreement. Hotel Owner may also deduct from Unit Owner's Rental Proceeds (to the extent available) all Assessments as defined in Section 6a. below, and pay such Assessments to the applicable payee.  The Hotel Owner's decision to apply all or any portion of Unit Owner's Rental Proceeds to the payment of any expenses, fees and/or assessments pursuant to Section 6, 7 or 8 shall be made in Hotel Owner's sole and absolute discretion.  In no event whatsoever shall Hotel Owner be obligated to apply any Unit Owner's Rental Proceeds to the payment of any expenses, fees and/or Assessments or to advance any of its own funds for such purposes.  In the event that any expenses, fees and/or Assessments due pursuant to Section 6, 7 or 8 are not paid promptly when due, then Hotel Owner may, in its sole and absolute discretion and without notice or demand upon Unit Owner, but shall not be obligated to, either: (i) withhold Unit Owner's Rental Proceeds until such funds are sufficient to bring the unpaid accounts current, and if and when sufficient funds are available, offset and apply Unit Owner's Rental Proceeds in the possession of Hotel Owner to the payment of any one or more of such unpaid accounts in such order as Hotel Owner in its sole and absolute discretion may elect; or (ii) terminate this Agreement upon five (5) days prior written notice to Unit Owner.

f.      No Pooling.   Unit Owner acknowledges that no pooling of revenues or income shall occur under the Rental Program.  Unit Owner also acknowledges that payment will only be made to the Unit Owner for the rental of the Owner Unit, and that Unit Owner will not receive any portion of monies received (i) for rentals of other Hotel Units, (ii) on account of any other charges incurred by Hotel Guests, or (iii) any other revenues or income received in connection with the operation of the Hotel.  Gross Unit Revenue will include deposits made and subsequently forfeited by prospective Hotel Guests in connection with the anticipated occupancy of the Owner Unit, but will not include any portion of any deposits collected and retained by any Hotel Operator unless the Owner Unit was specifically reserved for the prospective Hotel Guest's stay.

g.      **NO MINIMUM PAYMENT.   UNIT OWNER ACKNOWLEDGES THAT THERE ARE NO RENTAL INCOME GUARANTEES OF ANY NATURE, AND NO REPRESENTATIONS OTHER THAN WHAT IS CONTAINED IN THIS AGREEMENT.  HOTEL OWNER DOES NOT GUARANTEE THAT UNIT OWNER WILL RECEIVE ANY MINIMUM PAYMENTS UNDER THIS AGREEMENT OR THAT UNIT OWNER WILL RECEIVE RENTAL INCOME EQUIVALENT TO THAT GENERATED BY ANY OTHER HOTEL UNIT IN THE HOTEL.  FURTHERMORE, UNIT OWNER UNDERSTANDS AND ACKNOWLEDGES THAT NONE OF HOTEL OPERATOR, ITS SUBSIDIARIES, OR THEIR RESPECTIVE PARENT COMPANIES HAS ANY AFFILIATION WITH, OR UNIT OWNERSHIP INTEREST IN, HOTEL OWNER OR THE CONDOMINIUM. HOTEL OWNER IS ACTING UNDER THIS AGREEMENT SOLELY AS AGENT FOR UNIT OWNER.**

8

{007848-999994 00139377.DOC; 1}

h.    **UNIT OWNER'S ACKNOWLEDGEMENT.**  UNIT OWNER UNDERSTANDS AND ACKNOWLEDGES THAT EXECUTION OF THIS AGREEMENT AND PARTICIPATION IN THE RENTAL PROGRAM IS OPTIONAL AND IS NOT A REQUIREMENT OF OWNERSHIP OF THE OWNER'S UNIT. UNIT OWNER FURTHER ACKNOWLEDGES THAT NONE OF HOTEL OWNER, HOTEL OPERATOR, OR ANY OF THEIR RESPECTIVE OFFICERS, REPRESENTATIVES, EMPLOYEES, AGENTS, SUBSIDIARIES, PARENT COMPANY AND AFFILIATES HAS (I) MADE ANY STATEMENTS OR REPRESENTATIONS WITH RESPECT TO THE ECONOMIC OR TAX BENEFITS OF OWNERSHIP OF THE OWNER'S UNIT; (II) EMPHASIZED THE ECONOMIC BENEFITS TO BE DERIVED FROM THE MANAGERIAL EFFORTS OF HOTEL OWNER OR HOTEL OPERATOR OR FROM PARTICIPATION IN THIS RENTAL PROGRAM; OR (III) MADE ANY SUGGESTION, IMPLICATION, STATEMENT OR REPRESENTATION, THAT ANY POOLING ARRANGEMENT WILL EXIST WITH PARTICIPANTS IN RENTAL PROGRAM OR THAT UNIT OWNER WILL SHARE IN ANY WAY IN THE RENTAL PROCEEDS OF OWNERS OF OTHER HOTEL UNITS.

6.    **OWNER UNIT EXPENSES**

a.    Fixed Expenses.  Unit Owner agrees to timely pay the following obligations with respect to Owner Unit directly to the applicable payee:  (i) all assessments and other amounts due pursuant to the Declarations or any reciprocal easement agreement affecting the Owner Unit (**Assessments**); (ii) the Reserve amount and all other fees and charges to Hotel Owner pursuant to Section 8; (iii) all utilities with respect to Owner Unit to the extent not otherwise included in the Assessments (including, as applicable, high speed internet, cable (or its equivalent) television services, but excluding telephone service and long distance charges of Hotel Guests; (iv) real estate and personal property taxes with respect to the Owner Unit; (v) debt service with respect to any mortgage or other financing, or both, of the Owner Unit and its contents; (vi) all insurance costs with respect to the insurance required to be maintained and obtained pursuant to Section 7, (vii) cable/satellite television charges including pay-per-view charges. Unit Owner shall not allow title to the Owner Unit to be encumbered by a lien for non-payment of fees and assessments due pursuant to the Declarations or any reciprocal easement agreement affecting the Owner Unit. Unit Owner shall provide Hotel Owner with written evidence of payment of all such fees, costs and assessments due and owing as to the Owner Unit.

b.    Charges of Unit Owner.  Unit Owner agrees to timely pay the following amounts to Hotel Owner:  (i) all amounts required to be paid by Unit Owner in this Agreement, or any amounts otherwise advanced or funded on Unit Owner's behalf; (ii) all fees and charges for Hotel Services (as defined in Section 9(e)) used during a period of use by Unit Owner or its Personal Guests but which are not otherwise collected at check-out; (iii) a Departure Cleaning Charge after each Period of Personal Use pursuant to Section 9(f).

c.    Tax Withholding.  Unit Owner shall be responsible for all federal, state or local income or other tax imposed on Unit Owner or with respect to the income or receipts from an Owner Unit.  Upon execution of this Agreement, Owner shall provide to Hotel Owner a properly completed and executed IRS Form W-9 or W-8 or, if Unit Owner is not a U.S. Person (as defined under applicable law), a certification of foreign status on IRS Form W-8BEN, W-8ECI or other applicable IRS Form.  Hotel Owner is authorized to withhold all such amounts from payments to be made to Unit Owner as required by law.  If Hotel Owner is required to withhold any amounts for taxes payable, it shall provide Unit Owner with documentation identifying the amount of taxes withheld and such other information as is required by applicable law.

d.    Proof of Payment.  Upon request of Hotel Owner, Unit Owner shall deliver to Hotel Owner appropriate evidence of payment of any expenses of the type referred to in this Section 6 herein to the extent such payments are not made by Hotel Owner on Unit Owner's behalf.

9

7.      **INSURANCE.**

a.      <u>Unit Owner to Maintain Insurance.</u>  Unit Owner shall maintain in effect at all times during the Term, at Unit Owner's expense, such general public liability insurance, property insurance or other insurance as is required by Hotel Owner or Hotel Operator from time to time, or as is otherwise required by applicable law.  Such insurance shall include liability coverage with limits of not less than $1,000,000 per occurrence and in the annual aggregate and property insurance covering its personal contents and fixtures with the Owner Unit for which Unit Owner is responsible.  The property insurance shall include deductibles that are usual and customary and shall be maintained with a financially sound and reputable insurance companies deemed acceptable by Hotel Owner in its sole discretion.  All policies shall include Hotel Owner and any Hotel Operator and such affiliates of Hotel Operator as Hotel Operator may designate from time to time ("Hotel Operator's Affiliates") as additional insureds with a copy of the endorsement attached to the certificate of insurance.  This insurance shall apply as primary with respect to any other insurance or self-insurance available to Hotel Owner, Hotel Operator and Hotel Operator's Affiliates.  Unit Owner waives on behalf of itself and its insurers all rights against Hotel Owner, Hotel Operator and Hotel Operator's Affiliates and its agents, officers, directors, and employers for recovery of damages to the extent these damages are covered by its insurance regardless of deductibles, if any.  The requirements contained herein shall not be construed in any manner to relieve or limit Unit Owner's indemnification obligations for any loss or claim arising out of this Agreement.  Unit Owner shall further provide certified copies of all insurance policies required above within ten (10) days of Hotel Owner, Hotel Operator and Hotel Operator's Affiliates written request for said copies.

b.      <u>Evidence of Insurance.</u>  Unit Owner shall deliver to Hotel Owner certificates of insurance evidencing (i) that the required insurance is in full force and effect, and (ii) that Hotel Owner shall receive thirty (30) days written notification from each and every insurance company before an insurance policy is canceled for any reason, including, but not limited to, failure by Unit Owner to pay any premium or to renew any insurance policy provided for by this Agreement.  Unit Owner shall deliver the above-mentioned certificate(s) of insurance to Hotel Owner on or before the date this Agreement goes into effect and from time to time thereafter upon written request by Hotel Owner and/or the Hotel Operator.  Failure to so deliver such certificates of insurance promptly shall be considered a material breach of this Agreement and Hotel Owner may, at its option, either terminate this Agreement effective immediately or obtain (but Hotel Owner shall not be obligated to obtain) the required insurance for Unit Owner.  If Hotel Owner obtains the required insurance on behalf of Unit Owner, Unit Owner shall reimburse Hotel Owner upon demand for all costs incurred.  Hotel Owner shall have the right to retain Unit Owner's Rental Proceeds until such funds are sufficient to reimburse Unit Owner for all costs incurred, together with interest at the rate specified herein per month from the date the expenditure was incurred until Hotel Owner is reimbursed in full for all costs incurred, without waiving the right to pursue such other remedies against Unit Owner as may be permitted by law.

c.      <u>Association Insurance.</u>  Unit Owner may be excused from providing the insurance required by this Section 7 if and only to the extent such coverages are maintained by a condominium association established under the Declarations and such association otherwise complies with the requirements of this <u>Section 7</u>.

8.      **CONDITION OF OWNER UNIT**

a.      <u>Maintenance of Hotel Standards.</u>  The Owner Unit must at the commencement of the Term and at all times thereafter during the Term be maintained, furnished, finished, supplied and equipped in compliance with the standards of the Hotel in effect from time to time as established and determined by Hotel Owner in its sole discretion (the ***Hotel Standards***).  Unit Owner shall be solely responsible for payment of the costs of maintaining the Owner Unit to the Hotel Standards.  The Hotel Owner shall at all times maintain all keys to the Owner Unit and shall

10

have the right of reasonable inspection of the interior of the Owner Unit to confirm that the Owner Unit meets the Hotel Standards.

b.      Furnishing And Equipping Of Unit.  Unit Owner acknowledges and agrees that, as a condition to participating in the Rental Program, it must furnish and equip the Owner Unit with the standard furniture, accessories and appliances package selected by Hotel Owner and otherwise consistent with the Hotel Standards (including, without limitation, furnishings, furniture, accessories, appliances, curtains, carpeting, wall coverings, kitchen, bath and bedding items, dishes, silverware, glassware, cookware, linens, bedding and bath accessories).  Unit Owner agrees, at Unit Owner's sole cost, to maintain in place and in good repair and to upgrade and replace as and when required by Hotel Owner, the standard furniture, accessories and appliances necessary to meet the Hotel Standards as in effect from time to time.  Unit Owner agrees that if the Owner Unit or its furnishings or contents require repair or replacement, or if any items are missing, then Hotel Owner shall have the right, but not the obligation, to repair or replace the items and deduct the costs thereof from Unit Owner's Rental Proceeds or to bill Unit Owner directly.  If the cost to repair or replace items for any one month exceeds $300.00, Hotel Owner at its option can collect the money from the Unit Owner, or it can pay it out of the Reserve for Replacement fund.

c.      Replacement Reserve.  Unit Owner agrees that an amount equal to five percent (5%) of Gross Room Revenues for the prior month (the *Reserve for Replacement* or *Reserve*) shall be withheld from Unit Owner's share of Net Rental Income each month and deposited into a bank account controlled and set up for this purpose by Hotel Owner.  The amounts in the Reserve shall be used for the repair or replacement of the furnishings and contents in the Owner Unit.  Hotel Owner may, but shall not be obligated to, use the Reserve for normal day-to-day operating repairs or replacement of any one item with a value of less than $300.00.  Replacements of $300.00 or more for any one item may, at Hotel Owner's option, based on need, be paid from the Reserve.  The funds in the Reserve may also be used to meet obligations under Section 6.  Upon sale of the Owner Unit, Unit Owner agrees that the funds being held in Unit Owner's Reserve for Replacement account shall be transferred to the account of the purchaser to pay for future renovations.  Hotel Owner will provide Unit Owner with a final statement for documentation for credit to Unit Owner at closing.

d.      Refurbishing And Upgrades.  Unit Owner may be required at Unit Owner's cost, to refurbish or redecorate the Owner Unit, including replacing, upgrading and/or augmenting furniture, accessories, appliances, curtains, carpeting, wall coverings and other items in a manner and as often as Hotel Owner deems, in its sole judgment, necessary in order to maintain a quality sufficient to meet the Hotel Standards.  The costs of such refurbishment, redecoration and replacement shall be paid for from the Reserve.  Any such costs in excess of the then balance of the Reserve shall be invoiced to and paid by Unit Owner.  If sums in the Reserve are not adequate to meet the anticipated costs of such refurbishment, redecoration, or replacement, Hotel Owner may require that Unit Owner deposit in the Reserve the amount of the anticipated deficiency before commencing such work and may suspend the Owner's Unit participation in the Rental Program until such deposit is made.

e.      Emergency Repairs.  Unit Owner authorizes Hotel Owner to make, and to deduct from Unit Owner's Rental Proceeds, emergency repairs at cost if, in Hotel Owner's discretion, such emergency repairs are necessary to protect from damage the interior of the Owner Unit, the interior of the Hotel Units, or the facilities at the Hotel.

f.      Deep Cleanings.  During the Term, Hotel Owner shall cause the Owner Unit to be deep cleaned periodically.  The Owner Unit shall be deep cleaned no less than two (2) times per calendar year and no more than four (4) times a calendar year as determined by Hotel Owner and based on the amount of usage the Owner Unit has experienced; provided that additional deep cleanings may be required in Hotel Owner's discretion if smoking or pets are permitted in

11

the Owner Unit or extraordinary circumstances are present.  Owner shall be responsible for paying all costs associated with deep cleaning.

       g.      Pest Control.  Unless already provided by any condominium association established under the Declarations, Unit Owner shall provide pest control services to the Owner Unit, as needed, at Unit Owner's expense.

       h.      Suspension from Rental Program.  Hotel Owner may refuse to rent the Owner Unit and suspend the Owner Unit's participation in the Rental Program if, in Hotel Owner's sole discretion, the Owner Unit is not maintained in accordance with the Hotel Standards.  Failure of Unit Owner to cause the Owner Unit to meet the Hotel Standards at any time during the Term shall be a default hereunder which shall entitle Hotel Owner to immediately discontinue renting the Owner Unit and move pending reservations to other Hotel Units until such time as the deficiency is remedied to Hotel Owner's satisfaction.  If Unit Owner fails to remedy the deficiency within thirty (30) days after written notice to Unit Owner, Hotel Owner may terminate this Agreement.

9.     **UNIT OWNER'S USE OF THE OWNER UNIT**.  Unit Owner and Hotel Owner agree that:

       a.      Unit Owner's Reservation.  Provided that Unit Owner is in compliance with the terms of this Agreement, requests by Unit Owner (for itself or on behalf of its Personal Guests) for reservations to use the Owner Unit (*Personal Use*) shall be accepted by Hotel Owner, subject to the limitations of this Agreement including, without limitation, prior confirmed reservations, blackout periods, seasonal limitations and extraordinary circumstances.  Unit Owner shall reserve the Owner Unit for Personal Use by delivering to Hotel Owner the Request for Reservation in the form attached to this Agreement as Exhibit A (the *Request for Reservation*) or other written request clearly identifying that it is a request for Personal Use and containing the same information as the form.  Unit Owner acknowledges that there is no guarantee that the Owner Unit will be available for Personal Use regardless of when the Unit Owner makes its Request for Reservation.  Hotel Owner will not be able to schedule Personal Use during periods of time when the Owner Unit has been reserved by a Hotel Guest.

       b.      Blackout Periods.  Unit Owner will not be permitted to reserve the Owner Unit for Personal Use during the following periods: Annual Fort Lauderdale Boat Show and Super Bowl XLIV Weekend (February 1-8, 2010) (*Blackout Periods*).  Hotel Owner shall have the right to establish additional Blackout Periods from time to time upon prior written notice to Unit Owner.

       c.      Seasonal Limitations.  Subject to availability at the time of Hotel Owner's receipt of the Request for Reservation, Unit Owner may reserve the Owner Unit for Personal Use for up to sixty (60) days during the High Season, and for up to sixty (60) days during the Low Season.  Unit Owner may reserve the Owner Unit for Personal Use subject to: (i) Unit Owner's delivery of the Request for Reservation to Hotel Owner no less than seven (7) days prior to the date of desired occupancy; and (ii) the Owner Unit's availability for the period requested at the time such Request for Reservation is received by Hotel Owner.  As used in this Agreement, *High Season* and *Low Season* shall mean the following:

| | |
|---|---|
| *High Season* | The period commencing November 15 and ending April 15. |
| *Low Season* | The period commencing April 16 and ending November 14. |

12

d.     Unit Owner  Compliance with Hotel Policies.  Unit Owner and its Personal Guests shall check in and register at the Hotel, establish credit, check out, and otherwise comply with the Hotel's arrival and departure and other check in and registration procedures.  Hotel Owner shall have control over the keys to the Owner Unit during the Term and shall issue them, as appropriate, to Unit Owner and Personal Guests during periods of Personal Use, and to Hotel staff to perform their duties.  Unit Owner agrees to return all keys at the end of any period of Personal Use.

e.     Hotel Services.  During periods of Personal Use, Hotel Owner will provide to Unit Owner and its Personal Guests the standard daily housekeeping and cleaning services and to supply the standard hotel amenities (such as soap, shampoo, coffee, etc.) at such rates as are determined by Hotel Owner from time to time.  Unit Owner and its Personal Guests may use any other service or amenity provided by Hotel Owner to a Hotel Unit or otherwise provided at the Hotel or Condominium.  Hotel Owner shall provide such services or amenities (*Hotel Services*) at such rates and on such other terms as are determined by Hotel Owner from time to time.  Unit Owner or its Personal Guest shall pay for all such services no later than the time of checkout. Unit Owner shall pay for any services or amenities provided to a Personal Guest and not paid for by such Personal Guest.

f.     Departure Cleaning.  Unit Owner or its Personal Guest shall pay a charge to Hotel Owner at the time of checkout to cover the costs incurred by Hotel Owner to clean, supply, and prepare the Owner Unit for rental under the Rental Program in accordance with the Hotel Standards.  The amount of such charge shall be established by Hotel Owner from time to time.

g.     Credit Card Authorization.  In order to secure Unit Owner's timely payment of funds, Unit Owner agrees to maintain a valid credit card authorization on file with Hotel Owner at all times as a source of funds.  A form of credit card authorization that may be required is attached to this Agreement as Exhibit B.  This card may be used by Hotel Owner to pay all expenses owed that are past due by 30 days from the date of the statement.  Hotel Owner will mail Unit Owner a copy of the receipt within thirty (30) days of each charge.  Unit Owner hereby authorizes Hotel Owner to access the credit card established in this paragraph to meet Unit Owner's financial obligations under this Agreement.

h.     Telephone Usage.  During periods of Personal Use, Unit Owner shall be charged for all long distance and local calls that are made through the Hotel's system at the same rate as Hotel Guests.  If Unit Owner has a private line for its use in the Owner Unit, Unit Owner is responsible for deactivating that line when not occupying the Owner Unit.  Hotel Owner shall not be responsible for any charges incurred in connection with use of Unit Owner's private line by Hotel Guests or by Unit Owner.

10.     **RULES AND REGULATIONS.**  Unit Owner and its Personal Guests shall at all times abide by and comply with all rules and regulations established from time to time by Hotel Owner any Hotel Operator or pursuant to the Declarations or any reciprocal easement agreement affecting the Owner Unit.  Unit Owner shall be responsible for advising all Personal Guests of such rules and regulations.

11.     **LIMITED POWER OF ATTORNEY.**  Unit Owner does hereby irrevocably name, constitute and appoint Hotel Owner, its legal representatives, successors and assigns as Unit Owner's attorney-in-fact for the Term for the limited purposes of (i) providing Hotel Guests with full access to all common areas associated with the Owner Unit, (ii) causing Unit maintenance activities required of Hotel Owner to be undertaken promptly, (iii) issuing and signing confirmed reservations for the Owner Unit and (iv) taking any action, that may be lawfully permitted and required to evict any Hotel Guest. This power of attorney is specifically limited to the above areas and is valid only when circumstances prevent Unit Owner from representing Unit Owner's interest in a timely manner.

13

12.     **STORAGE OF PERSONAL PROPERTY.**  Unit Owner shall not store or leave any property in the Owner Unit except items that may be securely and properly stored in the Owner Unit's designated locked Owner's closet, if one exists.  The Hotel Owner assumes no responsibility or liability for items stored by Unit Owner in the Owner Unit, whether or not such items are stored in designated locked Owner's closet.  Unit Owner hereby grants Hotel Owner access to the interior of the Unit Owner's closet and shall provide Hotel Owner with a copy of the key to the Unit Owner's closet. Hotel Owner shall be entitled to access the Unit Owner's closet (if any) in its sole discretion and without liability to Unit Owner to remove and discard any contents that are considered by Hotel Owner as a health or safety hazard or which interfere with the maintenance of the Hotel Standards.

13.     **TERMINATION AND DEFAULT**

a.      Default By Unit Owner.  If Unit Owner shall default in the performance of Unit Owner's obligations under this Agreement and such default shall continue sixty (60) days after Unit Owner's receipt of written notice from Hotel Owner specifying the default, Hotel Owner may, in addition to all other remedies available to Hotel Owner at law, terminate this Agreement and/or temporarily cease its efforts to rent the Owner Unit pursuant to this Agreement until such time as Unit Owner has cured the default or satisfied the deficiency; provided, however, if, as a result of such default, the Owner Unit is not in a condition suitable for rental, Hotel Owner may immediately cease renting the Owner Unit until such time as Unit Owner's default is cured at Unit Owner's expense.

b.      Default By Hotel Owner.  If Hotel Owner shall default in the performance of its obligations under this Agreement and shall fail to cure such default within sixty (60) days after Hotel Owner's receipt of written notice from Unit Owner detailing the default in question, Unit Owner may, as its sole and exclusive remedy, terminate this Agreement by delivery to Hotel Owner of a written termination notice at any time prior to the date that Hotel Owner has cured the default in question.

c.      Termination Upon Sale of Unit.  This Agreement shall automatically terminate upon the sale or other conveyance or transfer of title (voluntary or involuntary) of the Owner Unit from Unit Owner, unless Hotel Owner expressly waives such termination and approves an assignment of this Agreement to the subsequent Unit Owner of the Owner Unit.  Unit Owner shall provide Hotel Owner with at least thirty (30) days prior written notice of any proposed sale or other conveyance or transfer of title of the Owner Unit.  Unit Owner further agrees that the Owner Unit may not be shown to prospective buyers at any time that the Owner Unit is being rented to a Hotel Guest.  In the event that Hotel Owner waives such termination of this Agreement and approves the assignment of this Agreement to the subsequent Unit Owner, then the amounts then remaining in the Reserve shall not be delivered to Unit Owner and shall be retained by the Hotel (for the benefit of the subsequent Unit Owner) for use with respect to the Owner Unit in accordance with this Agreement (as assigned to such subsequent Unit Owner).

d.      Pending Reservations.  If the Term of the Agreement terminates or expires for any reason, this Agreement shall remain in full force and effect for any reservations of the Owner Unit that have been confirmed prior to written notice of termination of this Agreement (subject to Hotel Owner's good faith efforts to transfer any such confirmed reservation to another Hotel Unit in the Rental Program), and Unit Owner specifically agrees to honor this Agreement as to such periods of confirmed occupancy. Hotel Owner shall be entitled to receive any commissions, fees and/or expenses due as a result of the reservation made during the Term.   Unit Owner understands and agrees that while the Owner Unit may not be specifically reserved at the time this Agreement otherwise terminates, to the extent that total advance reservations for the Hotel would include the Owner Unit, then the Owner Unit shall be deemed reserved.

e.      Final Reconciliation.  Upon any expiration or termination of this Agreement, Hotel Owner shall prepare a final reconciliation of accounts (including all sums owed under any provision of this Agreement) and a final settlement shall be effected (by payment of funds)

14

{007848-999994 00139377.DOC; 1}

between Unit Owner and Hotel Owner within thirty (30) days of Hotel Owner's delivery to Unit Owner of such final reconciliation.  The foregoing obligations shall survive termination or expiration of this Agreement.

14.     **UNIT OWNER'S ACKNOWLEDGEMENTS.** Unit Owner acknowledges and agrees that:

- Execution of this agreement and participation in the Rental Program is optional and is not a requirement of unit ownership of the Owner Unit.

- Neither Hotel Owner nor any Hotel Operator, or any of their respective officers, representatives, employees, agents, subsidiaries, parent hotel owner and affiliates has (A) made any statements or representations with respect to the economic or tax benefits of unit ownership of the Owner Unit; (B) emphasized the economic benefits to be derived from the managerial efforts of Hotel Owner or from participation in the Rental Program; or (C) made any suggestion, implication, statement or representation, that any pooling arrangement will exist with participants in this program or that Unit Owner will share in any way in the rental proceeds of other Hotel Unit in the Hotel.

- Without prior notification, approval from and coordination with Hotel Owner, Unit Owner agrees not to use or enter the Owner Unit, nor will Unit Owner authorize any agent, independent contractor, or other person to use or enter the Owner Unit, except during periods of Personal Use pursuant to proper reservations.

- Unit Owner may not alter, modify or remove any electronic locking device or other type of locking device without the written consent of Hotel Owner.

- Neither this Agreement nor any other agreement for provision of rental services was entered into prior to Unit Owner entering into a binding, non-cancelable purchase agreement for the Owner Unit.

- Neither Unit Owner nor the Unit are under any contractual obligations or subject to other rental programs that would limit Unit Owner's ability to enter into this Agreement or comply with the provisions contained herein.

- Unit Owner has had all of its questions answered and has received all requested information regarding the Rental Program.

- No representation has been made that this Agreement will be renewed or extended.

- Each of Hotel Owner, any Hotel Operator, and their respective affiliates may engage in or possess an interest in other business ventures of every nature and description, independently or with other persons, including but not limited to the ownership, financing, sale, rental, operation, management, brokerage and development of real property, which may be adjacent to or competitive with, the Owner Unit.  Unit Owner shall not have any right by virtue of this Agreement in and to such other business venture or to the income or profits derived therefrom.

- Neither Hotel Owner, nor any Hotel Operator, or their respective affiliates shall be liable for losses or damages sustained by a Hotel Unit Owner to the Owner Unit or its contents as a result of theft or vandalism, the recovery of which, and the payment for which if recovery is unsuccessful, shall be the responsibility of Unit Owner.

15.     **ARBITRATION**

15

{007848-999994 00139377.DOC; 1}

    a.    <u>General</u>. All disputes related to or arising out of this Agreement shall be decided by arbitration in accordance with this Section 15.

    b.    <u>Selection of the Arbitrator</u>. The party initiating the arbitration shall give notice to the other party setting out the items to be arbitrated. Within ten (10) business days, the parties shall attempt to agree upon a neutral arbitrator to resolve the dispute. If the parties are unable to agree upon an arbitrator, the entity administrating the arbitration shall appoint the neutral arbitrator.

    c.    <u>Administration</u>. The arbitration shall be administered by Judicial Arbitration and Mediation Services (*JAMS*). If, at the time a dispute arises, JAMS does not exist or is unable to administer the resolution of the dispute, then the dispute resolution process shall be administered by the American Arbitration Association (*AAA*). If, at the time a dispute arises, AAA does not exist or is unable to administer the dispute resolution process and the parties cannot agree on the identity of a substitute service provider, then either party may petition the state or federal district court in the county in which the Hotel is located to appoint an arbitrator to administer the arbitration. If the court refuses to do so, either party may proceed by filing an action in any court of competent jurisdiction.

    d.    <u>Rules</u>. The arbitration shall be conducted in accordance with the rules of the service provider except to the extent inconsistent with this Agreement. The arbitrator shall strictly limit discovery, motion practice and collateral proceedings to resolve the dispute at issue as efficiently and expeditiously as reasonably possible.

    e.    <u>Equitable Relief</u>. Subject to the applicable law, the arbitrator has the power to grant equitable relief, both by way of interim relief or as a part of its final award.

    f.    <u>Fees and Expenses</u>. During the pendency of the arbitration, the parties shall share equally the fees and expenses of the arbitrator. As part of the award, the arbitrator shall designate the party whose position is substantially upheld, who shall recover from the other party all of its reasonable attorneys' fees, costs and expenses, including its share of the fees and costs paid to the arbitrator, expert witness fees, compensation for in-house counsel, and all other fees and expenses incurred in connection with the arbitration. The arbitrator may determine that neither party's position was substantially upheld or otherwise allocate the fees and expenses in accordance with the relative extent to which either party's position was upheld.

    g.    <u>WAIVER OF TRIAL BY JURY</u>. HOTEL OWNER AND UNIT OWNER, TO THE FULLEST EXTENT ALLOWABLE UNDER FLORIDA LAW, HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, COUNTERCLAIM OR CROSSCLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING ARISING UNDER, WITH RESPECT TO, OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND IRRESPECTIVE OF WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT OR OTHER TRIER OF FACTS WITH COMPETENT JURISDICTION AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY OR PARTIES HERETO TO WAIVE ITS OR THEIR RIGHT TO TRIAL BY JURY.

16.    **INDEMNIFICATION; RELEASE.**

    a.    <u>Indemnity</u>. Unit Owner shall defend, indemnify, protect and hold Hotel Owner, any Hotel Operator, and their respective affiliates, and any of their respective directors, members, managers, shareholders, officers, employees, consultants, agents or representatives (collectively, *Indemnified Parties*) harmless from and against and not liable for any and all claims, demands,

16

{007848-999994 00139377.DOC; 1}

damages, judgments, costs, losses, penalties, fines, liens, suits, actions, expenses and liabilities, including, without limitation, reasonable attorneys' fees and costs and expenses incident thereto. of any kind or nature (collectively, *Claims*) arising out of any action or omission or course of action on the part of any Indemnified Party in its performance of its obligations under this Agreement or otherwise in connection with any obligation incurred by or instrument executed by any of the Indemnified Parties alone or by any of the Indemnified Parties together with Unit Owner, whether or not any of the Indemnified Parties shall be the signatory or one of the signatories on behalf of Unit Owner and whether incurred or executed on behalf of Unit Owner provided that this indemnity shall not apply to any Claims resulting from the gross negligence or willful misconduct of an Indemnified Party.

b.    Releases.   Unit Owner hereby absolutely and irrevocably releases, remises, acquits and forever discharges all Indemnified Parties from any and all Claims of every kind or nature, known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, at law or in equity, including, without limitation, those arising out of or relating in any way to (i) this Agreement, (ii) the Rental Program, or (iii) the performance or non-performance of Hotel Owner's obligations pursuant to this Agreement or in connection with the Rental Program. Unit Owner hereby acknowledges and agrees that it is expressly releasing all Claims of which it has any knowledge or awareness, as well as all Claims of which it has or may have no knowledge or awareness, with regard to all Indemnified Parties. In so doing, Unit Owner expressly acknowledges that it is knowingly and intentionally waiving and relinquishing all rights and benefits which it has or may have under any law, rule or regulation under the law of Florida or of any other state or jurisdiction to the effect that unknown or unsuspected claims are not released by a general release of claims without any express waiver of such statutory or other protection.   The foregoing releases shall not extend to Claims that arise as a result of an Indemnified Party's gross negligence or willful misconduct in performing its duties under this Agreement.

17.    **MISCELLANEOUS PROVISIONS**. This Agreement shall be subject to and contingent upon the following:

a.    Exculpation.   Neither Hotel Owner nor Hotel Operator, nor any of their respective officers, representatives, employees, agents, subsidiaries, parent and affiliates shall be liable for any loss or damage to any person or property, including, but not limited to, Unit Owner, the Hotel Guests, the Owner Unit and its equipment, furnishings and appliances, of any nature resulting from any accident or occurrence in or upon the Owner Unit, the building in which the Owner Unit is a part of the Hotel, including but not limited to, any and all claims, demands, damages, costs and expenses (including, without limitation, attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) resulting from: (i) the acts or omissions of Hotel Guests; (ii) wind, rain or other elements; or (iii) theft, vandalism, fire or act of God.

b.    Entire Agreement.   The parties hereto agree and acknowledge that this Agreement constitutes the entire Agreement between, the parties and there are no oral or written amendments, modifications, other agreements or representations.

c.    Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, which shall control all matters relating to the execution, validity and enforcement of this Agreement.

d.    Owner Designate.   Recognizing the fact that there may be several Unit Owners of a single Owner Unit, it is hereby agreed that Unit Owner's designate, as listed on the front page of this Agreement, shall have the authority to issue any and all instructions to Hotel Owner, and Hotel Owner shall act in reliance thereon.

e.    Force Majeure.   Owner shall not be liable for, or deemed to be in default of, its obligations hereunder due to any of the following events or circumstances (*Force Majeure*): (a)

17

{007848-999994 00139377.DOC; 1}

earthquake, hurricane, tornado or flood or other act of God; (b) war, act of terrorism, insurrection, rebellion, riots or other civil unrest; (c) epidemics, quarantine restrictions or other public health restrictions or advisories; (d) strikes or lockouts or other labor interruptions not caused by a breach of any term or provision of this Agreement or any term or provision of any collective bargaining agreement affecting the Hotel by the party claiming the existence of Force Majeure; (e) disruption to local, national or international transport services; (f) embargoes, lack of materials, water, power or telephone transmissions; (g) failure of any applicable governmental authority to issue any approvals, or the suspension, termination or revocation of any material approvals due to reasons not caused by the party claiming the existence of Force Majeure; and (h) any other event or circumstance similar to those set forth in the preceding clauses (a) through (g) outside the reasonable control of the party claiming the existence of Force Majeure.

       f.     Severability.  If any clause or provision of this Agreement shall be held invalid or void for any reason, such invalid or void clause or provision shall not affect the whole of this Agreement and the balance of the provisions of this Agreement shall remain in full force and effect.

       g.     Advance of Funds.  Unit Owner hereby acknowledges and agrees that if Hotel Owner incurs any charge, fee, cost or expense with respect to the Owner Unit pursuant to this Agreement or otherwise at the request or with the consent of Unit Owner, Hotel Owner shall have the right to deduct such expenditures from Unit Owner's Rental Proceeds or other funds of Unit Owner that are available to Hotel Owner, such as the Reserve.  The foregoing shall survive termination or expiration of this Agreement.  If Hotel Owner or any Hotel Operator advances funds to fulfill Unit Owner's obligations under this Agreement, the same shall be repaid with interest at an annual rate of interest equal to the lesser of (a) 1.5% per month, or (b) the highest lawful rate.

       h.     Notices.  Any notice or demand required under this Agreement or by law shall be in writing and shall be deemed effective upon receipt if sent by personal delivery, upon one (1) business day if sent by express overnight delivery with a nationally recognized courier service (such as Federal Express) or three (3) business days after having been sent by US mail, certified mail, return receipt requested.  If notice is to be given to Unit Owner, it shall be sent to the address appearing on the first page of this Agreement; if notice is to be sent to Hotel Owner, it shall be sent to the address below.  Either party may change such addresses with written notice to the other party.

_____

_____

_____

_____

       i.     Authority.  Unit Owner represents and warrants to Hotel Owner that Unit Owner has the full authority to enter into this Agreement, and that there is no other party with an interest in the Owner Unit whose joinder in this Agreement is necessary.

       j.     Binding Effect.  This Agreement will run with the land and will be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of Unit Owner.  Unit Owner covenants and agrees for itself and for its successors and assigns that the conveyance of any interest in the Owner Unit to any other person or entity shall constitute an assumption by such successors, assigns or transferees of all of the duties and obligations arising under this Agreement and upon any such conveyance the predecessor-in-interest of such assuming party shall be deemed to be relieved from any and all obligations or responsibilities arising under this Agreement.

18

k.    <u>No Third Party Beneficiary</u>.  This Agreement is solely for the benefit of the parties hereto and there are no intended third party beneficiaries to this Agreement

l.    <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be considered an original for all purposes.

m.    <u>Modification and Changes</u>.  Except as otherwise expressly provided for in this Agreement, this Agreement cannot be changed or modified except by another agreement in writing signed by Hotel Owner and Unit Owner or by their respective duly authorized agents.

n.    **<u>LIMITATION ON REMEDIES</u>.  ANYTHING IN THIS AGREEMENT AND ANYTHING AT LAW OR IN EQUITY TO THE CONTRARY NOTWITHSTANDING, IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING UNDER OR WITH RESPECT TO THIS AGREEMENT OR IN ANY MANNER PERTAINING TO THE HOTEL, THE OWNER UNIT, THE RENTAL PROGRAM, ANY CLAIMED BREACH OF FIDUCIARY DUTIES OR TO THE RELATIONSHIP OF THE PARTIES HEREUNDER, EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY AGREES THAT EACH PARTY WILL ONLY CLAIM AND BE ENTITLED TO RECEIVE FROM THE OTHER PARTY HERETO HIS OR HER ACTUAL DAMAGES, AND  WAIVES AND RELEASES ANY RIGHT, POWER OR PRIVILEGE EITHER MAY HAVE TO CLAIM OR RECEIVE FROM THE OTHER PARTY HERETO ANY PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES, OR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES.   THIS SECTION SHALL SURVIVE TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

o.    <u>Memorandum of Agreement</u>.  At Hotel Owner's request, the parties will execute a memorandum of this Agreement, Hotel Owner and Unit Owner agree that Hotel Owner may, in its discretion, cause this Memorandum to be recorded in the land records of the county in which the Condominium is located at any time during the Term.

*[Signatures on following page]*

19

{007848-999994 00139377.DOC; 1}

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth above.

Signed and delivered in the presence of:

**HOTEL OWNER**

**Q CLUB HOTEL LLC**

Witness: _____

By:  HILTON MANAGEMENT LLC,
    its authorized representative

Witness: _____

By: _____

Date: _____

Name: _____

Date: _____

**UNIT OWNER**

_____

Witness: _____

_____

Witness

Date: _____

Date: _____

20

{007848-999994 00139377.DOC; 1}

**EXHIBIT A**

**Form of**
**Unit Owner's Request For Reservation**


TODAY'S DATE: _____
UNIT NUMBER: _____
CHECK-IN DATE: _____
CHECK-OUT DATE _____
NAME OF OCCUPANT(S): _____

IF OCCUPANT IS NOT UNIT OWNER, ALL INCIDENTAL CHARGES ARE TO BE PAID BY:

_____ UNIT OWNER     _____ PERSONAL GUEST OF UNIT OWNER*

I, _____, hereby attest that the guest(s) of my Unit are in compliance with all terms and procedures set forth in this Unit Management Agreement and I have not been compensated for usage of my Unit whatsoever.  If not in compliance with all terms and procedures set forth in this Unit Management Agreement, I understand that the Hotel has the right to seek compensation through whatever means necessary.


_____                    _____
(Owner Signature)                                      (Date)



COMMENTS:

_____

_____

_____



_____

* Unit Owner remains liable for all charges incurred by Personal Guests of Unit Owner that are not paid for at time of check-out.

21

{007848-999994 00139377.DOC; 1}

**EXHIBIT B**

**Hilton Fort Lauderdale Beach Resort**

**Credit Card Authorization Form**

As evidenced by my signature below, I _____, hereby authorize the [Hotel Name] to charge my credit card listed below in accordance with the Unit Management Agreement governing the rental of Unit No. _____ at the Hilton Fort Lauderdale Beach Resort.

Credit Card Type: _____
                  (American Express, Diner's Club, Discover, Visa, Master Card)

Credit Card Number: _____

Expiration Date: _____

Card Holder Name: _____

Billing Address: _____

                 _____

                 _____

Telephone: _____

Cardholder Signature: _____

Date: _____

ATTACH A CLEAR PHOTOCOPY OF THE FRONT AND BACK OF YOUR CREDIT CARD

For Office Use Only:   Unit Owner: _____

                       Unit Number: _____

                       Trace Date: _____

                       Processed By: _____

22

{007848-999994 00139377.DOC; 1}

# Exhibit

# "C"

**From:** Michele Santoro [mailto:micheles@qclubresort.com]
**Sent:** Tuesday, May 12, 2009 1:35 PM
**To:** 'Michele Santoro'
**Subject:** Q Club - May 12 2009

# Q CLUB HOTEL, LLC

May 12, 2009

# E-mail blast

After much correspondence that has come to you from this office and your Board of Directors, it is imperative to let you that there is no intention to operate the hotel under two Unit Management Agreements. That being said, May 22, 2009 will be the last opportunity to enroll in the only Unit Management Agreement that is going to be offered.

Despite the worst crises ever to affect the hospitality industry, our hotel is still performing extraordinarily well, outperforming the competitive market by a wide margin in all measurable areas. Given the current economic conditions that exist, although there are no guarantees, you can rest assured that management is prepared to take on the challenges that may arise in the coming months.

I must make you aware that notices of cancellation will be sent to a number of unit owners beginning May 22, 2009. In fact, several 60 day cancellation notices have already been sent to owners. As stated in earlier correspondence, by signing the new Unit Management Agreement, your unit will continue to be rented without interruption as well as the payments being made for you (i.e. Shared Costs, FPL, Housekeeping, etc.). The enclosed signature pages must be returned on or before May 22, 2009 to ensure your continued enrollment in the rental rotation. Q Club Hotel, LLC intends, in the coming months, to continue a systematic cancellation/removal of units from the rental program that have not signed the new Unit Management Agreement. This process is needed in order to manage the future hotel inventory and guest reservation system for those still in the rental program.

Once again, we request that you sign the new Unit Management Agreement so that we can continue to keep this property on the successful path it has been on since inception.

As always, if you should have any questions please do not hesitate to contact Michele Santoro at 954-727-9995 or via e-mail, micheles@qclubresort.com.

# Exhibit

# "D"

# Q CLUB HOTEL, LLC

June 1, 2009

Dear Q Club Unit Owner,

We are in receipt of a letter from The Q Club Unit Association Board of Directors, Chuck Thomas and Fred Burgess, dated May 22, 2009 in which they have indicated you authorized them to send in your objection to the new Unit Management Agreement. The Board's letter was sent on behalf of those who have not signed the new UMA. If you have returned your executed new UMA, you do not need to return the enclosed forms.

There is no intention to manage the hotel under two separate management agreements. Q Club Hotel, LLC intends, in the coming months, to continue a systematic cancellation/removal of units from the rental program that have not signed the new Unit Management Agreement. We have already canceled more than 40 of the 162 on the objection list that the Board of Directors, Chuck Thomas and Fred Burgess sent to us. This process is needed in order to manage the future hotel inventory and guest reservation system for those still in the rental program. If you do not want your unit to be canceled, you will need to sign the attached signature pages as soon as possible and return by fax, e-mail or in the enclosed self-addressed stamped envelope.

It has come to our attention that Fred Burgess and Chuck Thomas have charged a number of expenses to the Condominium Association that are not proper Association expenses. These expenses consist of attorney's fees, and possibly consulting fees, generated by Messrs. Burgess and Thomas in contesting the New UMA. Neither the Association nor the Hotel Owner are obligated for, or will pay, these expenses that have been, and continue to be, incurred by these gentlemen. Messrs. Burgess and Thomas are attempting to hold YOU responsible for these expenses.

Once again, we request that you sign the new Unit Management Agreement so that we can continue to keep this property on the successful path it has been on since inception. As has been stated earlier, should a better Unit Management Agreement become available, you will have the opportunity to enroll.

Sincerely,

Q Club Hotel, LLC

Enclosures

# UNIT MANAGEMENT AGREEMENT

This UNIT MANAGEMENT AGREEMENT (this *Agreement*) is made and entered into this __1st__ day of _____, 200_9_ (the *Effective Date*) by and between Q Club Hotel, LLC, a Florida limited liability company (*Hotel Owner*), and the owner(s) identified below (individually or collectively and jointly and severally *Unit Owner*).

**Hotel/Resort**:   Hilton Fort Lauderdale Beach Resort

**Owner Unit Number**: _____

**Name of Unit Owner**: _____

**Mailing Address of Unit Owner**:

_____

_____

_____

*If there are multiple Unit Owners, a list of the names and contact information for all Unit Owners must be attached to this Agreement.*

**Primary Telephone Number**: _____

**Alternate Telephone Number**: _____

**E-mail Address**: _____

**SS#/EIN**: _____

**Unit Owner's Designate**: _____
*If there is more than one Unit Owner or Unit Owner desires to designate another person who is authorized to act on Unit Owner's behalf*

## BACKGROUND

A.      Unit Owner is the owner of, or will acquire ownership of, the condominium unit identified above (the *Owner Unit*) in the condominium project known as "Q-Club Resort and Residences Condominium" (the *Condominium*) located in Fort Lauderdale, Florida.     The Condominium has been established pursuant to one or more declarations of condominium and declarations of covenants, conditions and restrictions (together with all bylaws, rules and regulations issued thereunder, the *Declarations*) which have been or will be recorded in the county records of the county in which the Hotel is located.

B.      The Condominium has been established and created in a building, a portion of which is comprised of a hotel owned by Hotel Owner known as the Hilton Fort Lauderdale Beach Resort (the *Hotel*).

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth above.

Signed and delivered in the presence of:

**HOTEL OWNER**

_____
Witness:

**Q CLUB HOTEL LLC**

By: HILTON MANAGEMENT LLC,
    its authorized representative

_____
Witness:

By: _____

Date: _____

Name: _____

Date: _____

**UNIT OWNER**

_____
Witness:

_____

_____
Witness

_____

Date: _____

Date: _____

# 09-60911-Civ-JORDAN/MCALILEY

**JS 44** (Rev. 2/08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as re
by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of
the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed C**

FILED by **DJ** D.C.
ELECTRONIC

**June 19, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**I. (a) PLAINTIFFS**

Q Club Resort and Residences Condominium Association, Inc.

**DEFENDANTS**

Q Club Hotel, LLC

**(b)** County of Residence of First Listed Plaintiff   **Broward**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **Miami-Dade**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Joseph E. Altschul, Esq.
2717 W. Cypress Creek Rd.
Ft. Lauderdale, FL 33309   Tel. 954-556-4821

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☐ PALM BEACH   ☐ MARTIN  ☒ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE   HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☑ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | |
| | Employment | ☐ 550 Civil Rights | Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | Statutes |
| | Other | | Detainee | | |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).**
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO       b) Related Cases ☐ YES ☑ NO

JUDGE                                   DOCKET NUMBER

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Civil Statute: 15 USC 1, 14
Brief Description: Monopolization and Anticompetitive Contract
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Rescission, Reformation

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
June 18, 2009

FOR OFFICE USE ONLY
AMOUNT 350.00   RECEIPT # 125975   IFP